UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Criminal No. 4-20-CR-582 |
| | § | |
| HECTOR AARON RUIZ | § | |

### UNITED STATES' RESPONSE TO DEFENDANT'S MEMORANDUM IN SUPPORT OF PRETRIAL RELEASE

The United States respectfully requests the Court continue to detain the Defendant, who has been indicted by the Federal Grand Jury for sexually assaulting two women, possessing a firearm during both of these crimes of violence, and for obstructing justice – all of which he committed using his badge as a sworn officer of the law. The Defendant, a violent offender, has not rebutted the presumption that he should be detained. Although he was previously released by the State when he was facing 2-20 years for the state offenses, the actions of the Federal Grand Jury places the Defendant in a far graver situation: he now faces both a statutory maximum ***and*** a prospective Sentencing Guidelines calculation of life in prison. The stakes for him, his victims, and the community are far higher now, and the Court should continue to detain him.

"An assessment of whether conditions of bond will reasonably assure a defendant's appearance must take into account: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence; (3) the defendant's history and characteristics including, among other things, his family ties, length of residence in the community, community ties, and past conduct; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release." *United States v. Acosta-Leyva*, 751 Fed. App'x 594, 595 (5th Cir. 2019) (citing 18 U.S.C. § 3142(g)).

Because the Grand Jury found that sufficient evidence existed to indict him on two counts of possession of a firearm during a crime of violence, there is also a rebuttable presumption that no condition of release exists that would reasonably assure his appearance and the safety of the community. *See* 18 U.S.C. § 3142(e)(3)(A); *see also United States v. Rueben*, 974 F.2d 580, 586 (5th Cir. 1992). "[T]hat presumption is not a mere 'bursting bubble' that totally disappears from the judge's consideration after the defendant comes forward with evidence." *United States v. Hare*, 873 F.2d 796, 798 (5th Cir. 1989). To the contrary, the Fifth Circuit specifically held that "Congress intended that the presumption 'remain in the case as a factor to be considered by the judicial officer.'" *Id.* (internal edits and citations omitted). As such, in weighing the four factors identified by 18 U.S.C. § 3142(g),

this Court should also consider Congress's specific finding that violent offenders such as the Defendant pose a "special risk of flight and dangerousness to society." *Id*. at 798 (presumption applicable to drug offenders); *United States v. Bess*, 678 Supp. 929, 936 (D.D.C. 1988) (discussing similar determination by Congress regarding the dangerousness of defendants who violate 18 U.S.C. § 924(c) when crafting the presumption).

The United States respectfully submits that these four factors, in concert with the presumption that violent offenders should be detained, weigh squarely in favor of detention.

***First***, the nature and circumstances of the crimes with which Defendant has been indicted weigh strongly in favor of detention. In his first rape, the Defendant – while operating his marked squad car, wearing his full uniform, and after activating his lights and sirens - pulled over a young woman in the middle of the night. He didn't ask her for her insurance card or make sure she was safe to drive. Instead, he carefully turned off the audio portion of the dashboard camera, took her driver's license away from her, took her out of sight of the dashboard camera, and instructed her to follow him in her car to another location. Sensing something was off, Victim #1 tried to pull off and go in a different direction towards her mother's home, but he pulled her over with his lights and sirens a second time and ordered her to follow

him. Frightened of both him and the gun he prominently carried, she felt she had no choice but to comply. He drove her to a dark and secluded area, far away from any prospect of help. As she drove there, she began texting a friend that she was going to die:



See Govt. Exhibit 2. When he got Victim #1 to a secluded place where she could not readily get any help, he told her to "convince" him not to have her thrown in jail. She tried everything she could think to put him off, but to no avail. He laid his gun belt next to her, ordered her to take a swig of alcohol, and then raped her.

If the nature and circumstances of this rape weren't enough, the Defendant did the same thing to a second woman. He encountered Victim #2 during a traffic stop by another officer, but realized he was already casually acquainted with her. When Victim #2's boyfriend was placed under arrest and the car she had been in

was impounded, he offered to drive her and her young son home. At her house, he asked to go to the bathroom, and then called her into the back bedroom of the house. He then locked the door behind her, and while her young son was playing in the living room, laid his gun belt next to her and then physically and forcibly raped her. She said no, but he ignored her crying. He only stopped when her a family member who came by the house knocked on the locked door. Afterwards, he told her about the contacts he had in the community and threatened that he could make something happen to her if she told anyone.

The nature and circumstances of these two rapes and kidnappings weigh strongly in favor of detention. The Defendant does not appear to dispute this.

***Second***, the weight of the evidence cuts strongly in favor of detention. Victim #1 reported the crime the very same day it happened. DNA evidence corroborates this rape, and the victim's desperate text message to her friend as she was following him, in which she wrote "Ima die," starkly corroborates the very real fear she felt. At the detention hearing, the Defendant tried to contend that he had consensual sex with the young woman he pulled over in the middle of the night, but this argument should not be taken seriously. It entirely ignores the victim's text message, which is powerful evidence that she did not consent but rather was terrified for her life. It also ignores the Defendant's own contradictory and untrustworthy statements about

this rape. When interviewed, the Defendant first claimed he pulled someone over but just gave her a brief verbal warning and set her on his way. When confronted with evidence that this wasn't the case, he then changed his story and admitted that he actually spent hours hanging out with her, but that nothing happened. When confronted again with inconsistencies with this account, he admitted to having oral sex with the victim, admitted that she was not free to leave, admitted there was no reason to have her follow him, and admitted that he told her she had to convince him not to take her to jail. His story evolved a final time, after he was confronted with additional evidence, and he finally admitted to having sex with her. Even in his final version, however, the Defendant admitted he told her she had to convince him to have sex or else get locked up. This statement is remarkably close to a confession, and the Court should weigh this strongly in favor of detention.

The heavy weight of the evidence against the Defendant is compounded by Victim #2, who came forward shortly after she saw in the media that her police officer rapist had been placed under arrest. As a result of his badge, the connections he boasted about, and his threat to have something happen if she told anyone, she was terrified of coming forward and did not do so until after he was arrested on state charges. Victims #1 and #2 do not know each other, and the presence of multiple victims coming forward against the Defendant with similar accounts of him using

his power as a police officer to commit his crimes makes this factor weigh even stronger in favor of detention.[1] Although the Defendant coyly suggests that "the evidence is not as strong as the government may think," *see* Def. Mem. at 5, he certainly offers no evidence disputing either victim or the strong corroboration of these victims. As such, the Court should find this factor cuts cleanly in favor of detention.

***Third***, the Defendant contends that because he has not violated his release conditions on his state case, he should be released in this federal case. But the Defendant only faced 2-20 years in state court. He now faces a very real prospect of a ***life sentence*** in federal court. As such, the Defendant's calculus has now fundamentally changed. His past behavior, before being indicted on the much more serious federal charges carrying a real possibility of life imprisonment, is not a reliable indicator of the future behavior of a Defendant already charged with violent

---

[1] Recognizing that this factor strongly cuts against him, the Defendant tries to minimize it by citing a Ninth Circuit decision and a handful of district courts that have cited the Ninth Circuit in finding that this factor is the least important. *See* Def. Memo at 4 n.9. The Fifth Circuit has certainly not adopted this view, and it has been disputed whether even the Ninth Circuit really made such a bold holding. *See United States v Calabrese*, 436 F.Supp.2d 925, 927 n.3 (N.D. Ill. 2006) ("The prosecution correctly questions precedent instructing that the "the weight of the evidence is the least important" of the factors."). Indeed, even when affirming the very detention decision by the single Southern District of Texas case relied upon by the Defendant that cited this proposition, the Fifth Circuit noted that the "[t]he district court properly reasoned that the second § 3142(g) factor, "the weight of the evidence against the person," also tipped the scales in favor of detention." *United States v. Stanford*, 341 F. App'x 979, 982 (5th Cir. 2009). Accordingly, the United States submits that the Court should find that the weight of the evidence in this case is a compelling and substantial basis for detention.

offenses.

Violations of 18 U.S.C. § 242 are governed by U.S.S.G. § 2H1.3, which sets the base offense level at the "guideline applicable to any underlying offense." This cross reference takes us to aggravated sex abuse, which is governed by U.S.S.G. § 2A3.1, which sets the base offense at 30 levels since the conduct did not involve children. From there, the Defendant faces an additional four levels under § 2A3.1(b)(1) because the offense involved force or threats, an additional two levels under § 2A3.1(b)(3) because the victim was in defendant's care, custody or supervisory control, and an additional four levels under § 2A3.1(b)(5) – because he abducted his victim. After the aggravated sex abuse guideline is applied and the total of 40 levels is calculated, we return to the section 242 guideline and add an additional six levels under § 2H1.1(b)(1) because the offense was committed under color of state law. Finally, we add a two level enhancement under § 3C1.1 for the Defendant's obstruction of justice by turning off the camera, and we arrive at a total of 48 levels.

The Defendant's score of 48 levels is far above a guideline sentence of life in prison, which begins at 43 levels. Moreover, this analysis only calculates his guidelines as resulting from the rape of <u>one</u> of his two victims, and also puts aside the <u>five-year</u> mandatory consecutive enhancement under 18 U.S.C. § 924(c).

In sum, the Defendant faces an entirely different situation in federal court than he did when charged in state court. The stakes for him are suddenly far higher, and his behavior when facing a comparatively short sentence in state court is not enough to rebut the presumption that he should be detained – especially now that he knows he faces the very real prospect of spending the rest of his life in prison for his crimes.[2]

It also bears noting that the Defendant previously swore an oath to serve and to protect,[3] but in his brief time as a law enforcement officer, he used his badge, his sidearm, and his uniform to rape two women placed in his care. He obstructed justice by shutting off the audio to the dashboard camera that automatically activated when he used his lights and sirens to pull over Victim #1 the first two times, in an effort to hide his tracks. He then lied over and over when interviewed about Victim #1's allegations. He may appear as a loving person to his parents, family members, and

---

[2] Defendant contends that he should be granted pretrial release because the United States could have indicted him sooner, and could have had him arrested the day he was indicted by the federal grand jury. With all due respect, when the United States acts to charge a Defendant where the potential sentence is life in prison, it does so after a careful evaluation of all of the evidence. In this case, both the federal investigation and arrest of the Defendant have proceeded as quickly as could be reasonably expected during this national pandemic, which has slowed the government's ability to interview witnesses, obtain evidence, appear before a grand jury, and to place the Defendant in custody as quickly as normal.

[3] The widely used oath embraced by the International Association of Chiefs of Police reads, "On my honor, I will never betray my badge, my integrity, my character or the public trust. I will always have the courage to hold myself and others accountable for our actions. I will always uphold the Constitution, my community, and the agency I serve." *See* https://www.theiacp.org/sites/default/files/all/i-j/IACP_Oath_of_Honor_En_8.5x11_Web.pdf

other community members, but these crimes involved him breaking every oath he swore when he raped these two women three months apart.  As such, the United States respectfully contends that his history and characteristics only show a pattern of deception and untrustworthiness.

*Fourth*, the nature and seriousness of the danger to any person and the community resulting from the Defendant's release weighs in favor of detention.  The defendant demonstrated a far greater capacity for criminality and dangerousness because, unlike the common criminal, he is a trained law enforcement officer sworn to serve and protect and to uphold the law.  He must have necessarily crossed a much larger chasm between good and evil.

The Defendant knows the identity of his victims, and they will have to be constantly looking over their shoulder if the Defendant is released. Release is also likely to discourage any additional of the Defendant's potential victims from coming forward, much like Victim #2 did when she learned the Defendant was in custody and no longer in a position to harm her.  Likewise, the Defendant's volunteer work at a temple, which conveniently only began after his indictment on state charges, poses a risk to a religious community of mostly women.

Particularly given the presumption that violent offenders pose a "special risk of flight and dangerousness to society," *Hare*, 873 F.2d at 798, a weighing of the

four factors cut firmly against release. Accordingly, the United States respectfully requests that the Court detain the Defendant.

Respectfully submitted,

RYAN K. PATRICK
United States Attorney

By:    */s/ Sharad S. Khandelwal*
SHARAD S. KHANDELWAL
SEBASTIAN EDWARDS
Assistant United States Attorneys
U.S. Attorney's Office, S.D. Texas
Tel: (713) 567-9000

## Certificate of Service

I certify that, on the date this was filed with the Court, a copy of the foregoing was provided to counsel for Defendant via ECF and/or e-mail.

*/s/ Sharad S. Khandelwal*
SHARAD S. KHANDELWAL
Assistant U.S. Attorney