IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | CASE NO. 4:20-cr-00582-1 |
| | § | HOUSTON, TEXAS |
| VERSUS | § | TUESDAY |
| | § | NOVEMBER 24, 2020 |
| HECTOR AARON RUIZ | § | 11:09 A.M. TO 12:18 P.M. |

ARRAIGNMENT AND DETENTION HEARING
(VIA ZOOM)


BEFORE THE HONORABLE SAM SHELDON
UNITED STATES MAGISTRATE JUDGE



APPEARANCES:                    SEE NEXT PAGE

ELECTRONIC RECORDING OFFICER:   JOSEPH WELLS

CASE MANAGER:                   SHANNON JONES

TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 ELDRIDGE ROAD, #144
SUGAR LAND, TEXAS 77478
(281) 277-5325 (office)
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

<u>APPEARANCES (VIA ZOOM)</u>:


FOR THE GOVERNMENT:               U.S. ATTORNEY'S OFFICE
                                  Sebastian Edwards, Esq., AUSA
                                  1000 Louisiana, Ste. 2300
                                  Houston, Texas  77002
                                  713-567-9503



FOR THE DEFENDANT                 Javier O. Martinez, Esq.
HECTOR AARON RUIZ:                Attorney at Law
(VIA ZOOM)                        712 Main St., Ste. 2400
                                  Houston, Texas  77002
                                  713-228-8500



ALSO PRESENT:                     Lyndsey Fermin,
                                  U.S. Probation Office

<u>INDEX</u>

| WITNESSES: | <u>Direct</u> | <u>Cross</u> | <u>Redirect</u> | <u>Recross</u> |
|---|---|---|---|---|
| MICHAEL WHITMIRE | | | | |
| By Mr. Edwards | 7 | | | |
| By Mr. Martinez | | 33 | | |

| EXHIBITS: | | <u>Marked</u> | <u>Offered</u> | <u>Admitted</u> |
|---|---|---|---|---|
| Government's #1, #2 | | 10 | 10 | 11 |

1          HOUSTON, TEXAS; TUESDAY, NOVEMBER 24, 2020, 11:09 A.M.

2              THE COURT:  Okay.  So, let's see where we're at.

3     10-cr-582, Hector Aaron Ruiz.  Is that you, sir?

4              DEFENDANT RUIZ:  Yes, Your Honor.

5              THE COURT:  Okay.  And, Mr. Ruiz, I see your

6     attorney Javier Martinez.  He's here representing you.  And

7     who's here on behalf of the Government on this case?

8              MR. EDWARDS:  Your Honor, good morning.  Sebastian

9     Edwards representing the United States.  And I also have

10    Special Agent Michael Whitmire on the line who's here to

11    testify.

12             THE COURT:  Okay.  Good morning, Mr. Edwards, good

13    to see you.

14             So, Mr. Ruiz, we're here for two things, for an

15    arraignment and a detention hearing.  Normally we would

16    conduct these hearings with you in the courtroom, but because

17    of the pandemic we're doing this by video for safety.  If you

18    want you can give us consent to go forward with this hearing

19    by video or we could do this -- we could wait for the future

20    time when it's all safe for us to be in the courtroom

21    together.  Do we have permission to do this hearing by video

22    this morning?

23             DEFENDANT RUIZ:  Yes, Your Honor.

24             THE COURT:  And, Mr. Martinez, have you had the

25    opportunity to review the indictment with your client?

1          MR. MARTINEZ:  Yes, Your Honor, we've reviewed the
2     indictment together.
3          THE COURT:  And do you wish to enter a plea of not
4     guilty?
5          MR. MARTINEZ:  Yes, Your Honor.  We waive formal
6     reading of the indictment and enter a plea of not guilty.
7          THE COURT:  Okay.  Shannon, you want to give him
8     dates?
9          MS. JONES:  The motions deadline is December
10    the 8th, pretrial conference is January the 20th at 9:30
11    before Judge Eskridge, jury trial is January the 26th at 9:30.
12    And they also want to know Speedy Trial limits.  Is the Speedy
13    Trial waived?
14         MR. MARTINEZ:  Not at this time.
15         MS. JONES:  What is the estimated time for trial?
16         MR. EDWARDS:  One week.
17         MS. JONES:  Okay.  Thank you.
18         THE COURT:  And, Mr. Edwards, before we -- I
19    presume, Mr. Martinez, your client wishes to go forward with
20    the hearing?
21         MR. MARTINEZ:  Yes, Your Honor.
22         THE COURT:  Okay.  And both sides have reviewed the
23    Pretrial report and the addendum; is that correct?
24         MR. EDWARDS:  Yes, Your Honor.
25         MR. MARTINEZ:  Yes, Your Honor.

1          THE COURT:  Mr. Edwards, is this -- I get them

2     confused sometimes with new stuff.  Is this a presumption

3     case?

4          MR. EDWARDS:  It is, Your Honor.  We indicted

5     charges of violation of 18 U.S.C. 924©.  So, that's a crime of

6     violence and presumption.

7          THE COURT:  Okay.  So why don't you go forward then

8     with Mr. Whitmire.  There's no -- there's nobody -- is there

9     any concerns with -- because there's other people in the

10    courtroom.  Is there any concerns with safety and some of this

11    evidence that we'll want some of the other defendants not in

12    the courtroom hearing this, or not?

13         DEPUTY:  Your Honor, this is Deputy Elder (phonetic)

14    and I've already cleared the courtroom.

15         THE COURT:  Okay, thank you.  Thank you so much.

16         Go ahead, Mr. Edwards.

17         MR. EDWARDS:  All right.  Thank you, Your Honor.

18    Your Honor, I know you're pressed for time a little bit and

19    there's some more behind us -- but I know you don't

20    (indiscernible).

21         THE COURT:  I appreciate that.

22         MR. EDWARDS:  Agent Whitmire, are you ready to go?

23         AGENT WHITMIRE:  Yes.  Can you hear me?

24         THE COURT:  Yes.  And she'll swear you in first.

25         (Witness sworn.)

1               DIRECT EXAMINATION OF MICHAEL WHITMIRE

2     BY MR. EDWARDS:

3     Q    Agent Whitmire, could you just briefly introduce yourself

4     to the Court?

5     A    My name is Michael Whitmire.  I'm a special agent with

6     the FBI.  I'm assigned to the Texas City Resident Agency out

7     of the Houston Division.

8     Q    And how long have you been an agent with the FBI?

9     A    I graduated from the academy in January of 2005.

10    Q    Now you've -- this investigation was initially

11    investigated by the State; is that correct?

12    A    Yes.

13    Q    And Mr. Ruiz is facing State charges; is that right?

14    A    He is.

15    Q    All right.  And so have you had an opportunity to review

16    the State's investigation regarding Mr. Ruiz?

17    A    Yes.

18    Q    All right.  And that was conducted by the Texas Rangers

19    and the Manvel Police Department; is that correct?

20    A    Among others, yes.  As well as Wharton County Sheriff's

21    Office and the Fort Bend County District Attorney's

22    investigators.

23    Q    And have you had an opportunity to conduct your own

24    investigation as well?

25    A    Yes.

1    Q    And does that include speaking to both victims identified

2    as "L" and "M?"

3    A    Yes, it does.

4    Q    Or Victim 1 and 2 in the indictment.

5    A    Yes.

6    Q    Okay.  So I'd like to start off by talking to you about

7    Victim 1.  And I'm just going to kind of lead you for speed

8    purposes to where I'd like to -- to the heart of the matter.

9              Victim 1 on November 16, 2019, went to the Seaside

10   Lounge with a friend; is that correct?

11   A    I believe she went on the 15th of November.

12   Q    15, November 15.  So she went to the Seaside Lounge with

13   a friend by the name of Haley Ammons (phonetic); is that

14   correct?

15   A    Correct.

16   Q    And prior to getting to the Seaside Lounge they consumed

17   Patron.  They had a bottle Patron; is that right?

18   A    Yes.

19   Q    And so they consumed some of that Patron outside the club

20   and then they went into the club and spent several hours

21   there; is that right?

22   A    Yes.

23   Q    And inside the club Victim 1 consumed a little more

24   alcohol and at one point they left.  They left outside of the

25   club, went back to the vehicle and consumed some more Patron;

1    is that right?

2    A    Yes.

3    Q    And they left Seaside Lounge around 2:00 a.m. to leave

4    home; is that correct?

5    A    I believe about 1:30 or so, yes.

6    Q    Okay.  And they proceeded to Ms. Ammons' home where she

7    was to be dropped off; is that right?

8    A    That's correct.

9    Q    And then at that point Victim 1 left Ms. Ammons' home to

10   proceed to her own home because they were in her vehicle; is

11   that right?

12   A    Yes.

13   Q    All right.  And a portion of that bottle of Patron was

14   still in the vehicle unconsumed; is that right?

15   A    Right.

16   Q    All right.  So from that point could you explain what

17   Victim 1 indicated to both Texas Rangers and to yourself

18   during the interview with her occurring?

19   A    Yes, she was driving down Highway 6, I believe.  As she

20   passed the Arcola Police Department she was -- well, a police

21   officer came behind her and turned his red and blue emergency

22   lights on.  She did not think she was being pulled over

23   because she did not think she was speeding or doing anything

24   wrong, so she kept driving for approximately about four

25   minutes.  She continued to drive with the police officer with

1    his lights behind her.  She finally did pull over to the right

2    side of the road.  The police officer, who we now know as

3    Hector Ruiz, approached her car, told her to get out of her

4    car, took her back to the side of the road beside his car and

5    told her that he could arrest her for speeding, for running a

6    stop sign and for evading arrest for not stopping for him.  He

7    also then told her to follow him.  Mr. Ruiz got back in his

8    car, she got back in her car.  He kept her driver's license

9    with him.  Ruiz kept her driver's license.

10            Ruiz pulled out in front of her and started to make

11   a left-hand U-turn.  She did not follow him, but rather went

12   straight.  He pulled back in the line of traffic behind her,

13   followed her a few more minutes, pulled her over a second

14   time.  He walked up to her driver side window.  At this time

15   he was more irritated.  Told her again to follow him and then

16   he got back in his car, took off in front of Victim 1, and

17   this time she did follow him.  And then he continued driving

18   for several more minutes.

19   Q    Agent Whitmire, before you go on –

20            MR. EDWARDS:  -- I'd like to introduce Government

21   Exhibit #1, Your Honor.  You should have been given –

22            THE COURT:  I was.

23            MR. EDWARDS:  -- exhibits from the Government.  You

24   have Government Exhibit #1 in front of you?

25            THE COURT:  Yes, I do.

1    BY MR. EDWARDS:

2    Q    And, Agent Whitmire, do you have Government Exhibit #1 in

3    front of you?

4    A    I believe so, is that the map?

5    Q    That is the map.

6              THE COURT:  Any objection to Government Exhibit #1,

7    Mr. Martinez?

8              MR. MARTINEZ:  No, and just to streamline it I don't

9    have objection to Government's #2 either.  So –

10             THE COURT:  Okay.  Government Exhibit #1 and #2 will

11   be admitted.

12             MR. EDWARDS:  All right.  Thank you, Your Honor.

13   BY MR. EDWARDS:

14   Q    Agent Whitmire, so you indicated -- you were talking

15   about the first one, a first stop and a second stop and were

16   going on to talk about a third stop that Officer Ruiz and

17   Victim 1 made.  Could you indicate on the map -- And what part

18   of the city are we talking about?

19   A    For the third stop?

20   Q    No, no, no, just in general.

21   A    Oh, in general this is -- this entire activity occurred

22   near about Highway 6 between FM 521 and Highway 288, going up

23   to County Road 58, around the Arcola-Fresno area of Texas.

24   Q    Okay.  What's indicated as Stop B on the map is traffic

25   stop number one of Victim 1; is that correct?

1    A    That's correct.

2    Q    And did you review the dash cam footage of that first

3    traffic stop?

4    A    Yes.

5    Q    All right.  And did that dash cam footage corroborate

6    Victim 1's account?

7    A    Yes.

8    Q    All right.  Now you indicated that Officer Ruiz stopped

9    Victim 1, he proceeded to her vehicle; is that correct?

10   A    Yes.

11   Q    All right.  And she got out of her vehicle and then he

12   took her to the side of his vehicle; is that right?

13   A    Yes, to the passenger side.

14   Q    Passenger side of his vehicle.  Were they outside of dash

15   cam view during that time?

16   A    They were.

17   Q    At some point were they in dash cam view?  Did you see

18   the both of them?

19   A    Yes.

20   Q    And then they proceeded outside of the view of the

21   camera; is that correct?

22   A    That's correct.

23   Q    Now in your experience, if you're stopping a woman as a

24   law enforcement officer at 2:00 a.m. in the morning and it's

25   dark, is it protocol to take a subject outside of dash cam

1    view when you're conducting a stop?

2    A    In my experience, no, that's not protocol.

3    Q    Now could you describe what Victim 1 said was her state

4    of mind during that first traffic stop?

5    A    She was afraid.  She said it did not seem like a normal

6    traffic stop to her.  He had not asked for her car

7    registration or proof of insurance.  He had not performed any

8    sobriety tests on her.  She offered to let him search her

9    vehicle and he declined her offer to search her vehicle and

10   then told her to follow him.  And all that made her very

11   afraid that this was not a normal traffic stop.

12   Q    And did she say whether or not she was crying during the

13   first traffic stop?

14   A    Yes, and he -- Ruiz told her to calm down.

15   Q    And he also told her to follow him; is that correct?

16   A    That's correct.

17   Q    All right.  And based on dash cam footage did she in fact

18   follow him?

19   A    Briefly, yes.

20   Q    What were her actions after Officer Ruiz pulled off from

21   the first traffic stop?

22   A    She followed him immediately after they had pulled off

23   from the traffic stop until Ruiz tried to make a left turn and

24   she continued going straight.

25   Q    Okay.  And what happened then?

1    A    Officer Ruiz got back on the highway and followed her

2    some more, turned on his emergency lights again and pulled her

3    over a second time.

4    Q    Was Victim 1 on the phone at any point during these

5    traffic stops?

6    A    Yes, she called her friend Haley Ammons.

7    Q    And during that second traffic stop did she -- did she

8    indicate whether or not Officer Ruiz saw that she as on the

9    phone?

10   A    Yes, he did know that she was on the phone.

11   Q    All right.  And what was his reaction?

12   A    He told her to hang up the phone.

13   Q    And did she describe his demeanor during the second

14   traffic stop?  And this would be after he instructed her to

15   follow him and she did not follow him and he stopped her a

16   second time.

17   A    Yes, she said he was irritated.

18   Q    Okay.  Now were you able to hear any audio during either

19   the first or second traffic stop?

20   A    During the actual traffic stops, no.

21   Q    Did you hear any voices or any noise at all?

22   A    During the stops, no.

23   Q    And can you describe for the Judge how the dash cam and

24   audio system works, the system that the Arcola PD used?

25   A    Yes.  At that time the Arcola PD did not have body

1   cameras.  They had a body microphone and the car was outfitted

2   with a dash video camera.  The body microphone and the dash

3   video camera automatically start recording whenever the

4   emergency lights are turned on and remain recording the whole

5   time those lights are running.  The body microphone can be

6   manually turned off.  However, the dash cam video is always

7   actually recording and recordings can be pulled up for several

8   days after an event.  Yes.

9   Q    And so, just to simplify that, when an officer activates

10  his lights and siren, (indiscernible).  When an officer

11  activates his or her lights and sirens the audio portion of

12  the system should be working; is that correct, it's automatic?

13  A    Should be, yes.

14  Q    And so, if the audio portion isn't working, either it's

15  broken or the user has disabled the audio?

16  A    That's correct.

17  Q    Now during the first traffic stop when Officer Ruiz

18  activated his lights and sirens, could you hear those -- the

19  noise from the siren?

20  A    Yes.

21  Q    And at what point do you begin to hear complete silence?

22  A    At the first traffic stop as soon as both cars come to a

23  stop you hear a brief rustling and then dead silence.

24  Q    In that silence could you hear the door slam?

25  A    No.

1   Q    When Officer Ruiz re-enters the vehicle do you hear the

2   door slam at that point?

3   A    No.

4   Q    And during the second traffic stop did Officer Ruiz

5   activate his lights and sirens to stop Victim 1 for the second

6   time?

7   A    Yes.

8   Q    And again, do you hear any audio when the sirens are

9   activated?  Do you hear them making noise?

10  A    No.

11  Q    So when the siren is going you said that the audio

12  automatically is activated.  So can you hear the noise from

13  the sirens when they're (audio glitch).

14  A    During that stop, during the drive there was a couple of

15  seconds where you hear some audio, but 99 percent of the time

16  before the second stop there was complete silence.

17  Q    Okay.  And did you have an opportunity to talk to the

18  supervisor of Officer Ruiz about the system in his vehicle?

19  A    Yes.

20  Q    And what did that supervisor indicate about the

21  functionality and operation of the dash cam and audio in

22  Officer Ruiz's vehicle?

23  A    She explained to me how it worked, which I just explained

24  to the Court.  She was actually interviewed by the Rangers and

25  she told the Rangers that after she'd got into Ruiz's car

1    after this incident she had noticed that the microphone, the

2    audio microphone had been turned off several times.

3    Q    Okay.  Now you've taken us a little bit through

4    Government Exhibit #1, which is the Google Earth overlay.  You

5    talked about Stop B, which is the first traffic stop, correct?

6    A    Yes.

7    Q    And you talked about Stop C, which is the second traffic

8    stop, correct?

9    A    Correct.

10   Q    And the third that's indicated as Stop D, is that one

11   that Victim 1 discussed with you?

12   A    She did not discuss it, no.

13   Q    Is it because she could not remember that a third traffic

14   stop occurred?

15   A    That's correct, she did not remember.

16   Q    And what did the dash cam show of her during that third

17   stop?

18   A    Ruiz's vehicle drives onto a narrow country road.  He

19   pulls off on the right side.  It appears to be -- his car

20   appears to be illuminated from behind as if another vehicle

21   was behind it.  You see a shadow on the ground that shows --

22   appears to show the driver side door opening, a figure leaving

23   the driver side, and then driver side door shutting.  Ruiz's

24   vehicle sat in that spot for approximately 15 minutes not

25   moving.  You see a shadow come and the shadow of the driver

MICHAEL WHITMIRE - BY MR. EDWARDS                18

1     side door opens, the driver side door shuts, and his car

2     continues forward after 15 minutes.

3     Q    During this time that either vehicle is stationary or

4     they're moving towards the last and final traffic stop, which

5     is indicated as Stop D on the map, is Victim 1 speaking to

6     anyone on the phone?

7     A    She was communicating with her friend Haley Ammons.

8     Q    Did you have a chance to speak to Ms. Ammons or review

9     her interview?

10    A    I reviewed her interview.

11    Q    I'd like to turn to Government Exhibit #2, which are text

12    messages from -- between Victim 1 and Ms. Ammons.  Did you

13    have a chance to review these text messages?

14    A    Yes, I did.

15    Q    And did you have a chance to discuss these text messages

16    with Victim 1?

17    A    Yes.

18    Q    Now, if we can just go through the text messages really

19    quickly.  The first entry on the right side highlighted in

20    blue it states "call your mom."  And is that communication

21    from Ms. Ammons to Victim 1?

22    A    Yes.

23    Q    And the second communication states "wanna drive, I'ma

24    die."  Did you speak to Victim 1 about that?

25    A    Yes, I did.

1      Q    And what did she say she meant by that?

2      A    Well, she said she -- it was poorly written because she

3      was texting while she was driving.  But she said that meant

4      that she was -- she was driving and she was afraid she was

5      going to die during this encounter.

6      Q    Now the next few communications are from Ms. Ammons to

7      Victim 1.  And this appears to be an effort to let her know

8      that she's going to call her mom; is that right?

9      A    Yes.

10     Q    And then the next communication from Victim 1, she's

11     stating in three separate text messages, "stop calling," "OK,"

12     and "please."  Did you talk to her about why she sent these

13     text messages?

14     A    Yes, I did.

15     Q    What did she say?

16     A    She said that Officer Ruiz was with her at that point and

17     he was getting upset that her phone was receiving so many

18     calls and so many texts, and he was just upset at that and

19     wanted her to turn the phone off and stop talking to anyone.

20     Q    And did she comply with that?

21     A    She did.

22     Q    Okay.  So could you now take us to the last and final

23     traffic stop and describe what Victim 1 told you happened

24     then?

25     A    She followed Officer Ruiz down into a portion of a

1   subdivision, the rear of a subdivision that was still under
2   construction.  There were streets, but no houses back there,
3   no street lights.  And Officer Ruiz parked, she parked behind
4   him.  He got out of his car and got into her passenger seat.
5   He took off his gun belt and laid it on the center console
6   between them.  Had a center console that kind of bleeds into
7   the back seat.  She said he put his gun belt and his gun on
8   that center console.  He said -- told her how he was going to
9   convince me not to take me to jail, "I can arrest you," how he
10  was going to convince me.  He -- somehow he pulled down his
11  pants or unzipped his pants and it became evident to Victim 1
12  that he wanted her to perform oral sex on him.  She did
13  perform oral sex on him.  At some point during that act she
14  blacked out briefly.  When she came to Officer Ruiz was
15  standing outside her car, turned sideways.  He briefly
16  masturbated himself and ejaculated onto the ground out beside
17  her car.  And he kind of put his gun belt back on and zipped
18  his pants up and then he got back in his car, and she left.
19  Q    Now going back to what occurred inside her vehicle, did
20  Victim 1 indicate that she consumed more alcohol inside of the
21  vehicle?
22  A    Yes, she said that that bottle of tequila was still in
23  her passenger side floor.  Ruiz picked it up, handed it to her
24  and told her to drink more.  And she drank approximately two
25  shots worth of tequila.

MICHAEL WHITMIRE - BY MR. EDWARDS                                21

1    Q    Did she say whether Officer Ruiz drank any of the

2    tequila?

3    A    She said he did not drink any.

4    Q    Did she talk about any conversation that occurred in the

5    vehicle?

6    A    She said he was very brief.  He just said "how are you

7    going to convince me not to take you to jail."

8    Q    And did she talk about any of her efforts to delay or to

9    get out, you know, get away from this situation?

10   A    She said she asked for his name and his phone number in

11   an effort to later be able to identify him.  And she said that

12   she had talked about meeting up later as a way to kind of

13   diffuse the situation and get away.

14   Q    And did she talk about the presence of the weapon and the

15   impact that the presence of the weapon had on her?

16   A    Yes, she said she was afraid of the gun, afraid she'd be

17   harmed, Ruiz would use it to harm her.

18   Q    And was she -- did she say what her demeanor was during

19   this time?  Was she -- was she crying while they were inside

20   the vehicle?

21   A    She said she was crying pretty much the whole time she

22   interacted with him.

23   Q    All right.  And so after she performs oral sex on him she

24   says she blacks out and then she sees him outside the vehicle.

25   What occurred after that?

MICHAEL WHITMIRE - BY MR. EDWARDS                    22

1    A    Again, he masturbated and ejaculated on the ground.  He

2    got back in his car.  She drove off and then stopped maybe 100

3    yards ahead at an intersection.  I believe she realized she

4    did not have her license.  Ruiz pulled up behind her, she got

5    out, walked to his car and got her license from him, then she

6    got back in her car and they both went their separate ways.

7    Q    And did you have an -- so you talked about having an

8    opportunity to review Victim 1's friend's statement, Ms.

9    Ammons.  Did you have an opportunity to review the statement

10   of her mother?

11   A    Yes.

12   Q    And is it correct --

13   A    Victim 1's mother.

14   Q    I'm sorry?

15   A    It was Victim 1's mother, yes.

16   Q    Victim 1's mother.  Okay.  And is it correct that

17   Victim 1's mother described talking to her after the incident

18   and that Victim 1 was hysterical?

19   A    Yes, that's correct.

20   Q    She told her mother the story of her being stopped by the

21   officer and then taken to a secluded area and basically

22   indicating that she was forced to perform oral sex on him?

23   A    That's right.

24   Q    And did you have an opportunity to review and interview

25   Officer Ruiz?

MICHAEL WHITMIRE - BY MR. EDWARDS                    23

1     A     Yes.

2     Q     Who conducted that interview?

3     A     The Texas Rangers.

4     Q     Did he receive his Miranda warnings during that

5     interview?

6     A     No.

7     Q     Why not?

8     A     He was told he was there voluntarily, he didn't have to

9     talk to them.  He drove himself there and he drove himself

10    away from there.  And he was told it was a voluntary

11    interview.

12    Q     And did he discuss with officers the events that occurred

13    on that day?

14    A     He did.

15    Q     And is it correct that he gave several versions of what

16    occurred?

17    A     Yes.

18    Q     And one of those versions is that he gave Victim 1 a

19    light lesson and just let her off with a warning?

20    A     That's right.

21    Q     All right.  And then did that story then evolve to the

22    two of them hanging out for a couple of hours because Victim 1

23    wanted to, but nothing happened between the two of them

24    sexually?

25    A     Yes, uh-huh.

1   Q    All right.  And then further into the interview did the

2   story become that he actually admitted to keeping her driver's

3   license and telling her to follow him and convincing her --

4   telling her to convince him not to take her to jail.  But by

5   "convince" he meant she just needed to come up with a better

6   story as to why he shouldn't take her to jail?

7   A    That's what he said, yes.

8   Q    And then was, you know, kind of a fourth version of what

9   occurred that she tried to bribe him not to take her jail and

10  that he allowed her to perform oral sex on him and also he --

11  he engaged in vaginal penetration of her, but that he asked

12  her several times to make sure that it was okay?

13  A    That's correct.

14  Q    And was a DNA analysis conducted in this case?

15  A    It was.

16  Q    Is it correct that the sperm cells of Officer Ruiz were

17  found in the crotch of Victim 1's pants and were a positive

18  match for Officer Ruiz?

19  A    That's correct, they were.

20  Q    Now I want to go back really quickly if you'd talk a

21  little bit about the weapon that Officer Ruiz used.  Is that a

22  weapon that's issued by Arcola PD to him?

23  A    No, he bought his own.

24  Q    Is that Arcola PD protocol that the officer carries his

25  or her own weapon?

1    A    Yes.

2    Q    Was that weapon, I guess, registered with the PD, somehow

3    documented with the police department?

4    A    It's in their documentation, yes.

5    Q    Now I'd like to move on to Victim 2 in the indictment.

6         THE COURT:  On Victim 2, Mr. Edwards, can you just

7    give me the -- just have him just give me the abbreviated

8    version of what happened with Victim 2.

9         MR. EDWARDS:  Yes, Your Honor.

10   BY MR. EDWARDS:

11   Q    Just very abbreviated, Agent Whitmire.

12   A    All right.  Victim 2 at that time was a -- well, she and

13   her boyfriend had gone to a party.  Their, I believe, 8-year

14   old, 9-year old son was in the car, or her 9-year old son was

15   in the car with her.  The three of them were in the car.  The

16   boyfriend was driving.  The boyfriend was pulled over by Fort

17   Bend County Sheriff's for driving under the influence.

18   Officer Ruiz showed upon the scene to act as a translator and

19   he did translate.  The boyfriend ended up being arrested for

20   DWI.  Victim 2 and her son were put in the back of Officer

21   Ruiz's patrol car.  Officer Ruiz did what's called a courtesy

22   transport to drive her home.

23        According to her she was in the back of the car.

24   Officer Ruiz told her that the sheriff's office wanted to

25   arrest her for disobeying them and wanted to take her son

1    away, inferring CPS custody because he was in the car with a

2    drunk driver.  That Ruiz said he had helped her a lot that

3    night and had done a lot for her and protected her son for

4    her.

5            Eventually Ruiz drove her and the boy to the

6    boyfriend's house.  Other family members came and went.  There

7    was a big kind of melee.  It was very early in the morning.

8    Eventually -- and Ruiz said he wanted to stick around because

9    he knew the family and respected the family and wanted to tell

10   them the story and tell them how to get the boyfriend out of

11   jail.

12           Eventually all the family members left.  Ruiz,

13   Victim 2 and the 8-year old boy were the only ones in the

14   home.  Ruiz asked if he could use the bathroom.  Victim 2

15   pointed him to the bathroom attached to a bedroom.  He went in

16   there to use the restroom, then he went in -- Ruiz stayed in

17   the bedroom, asked Victim 2 to join him in the bedroom because

18   he wanted to talk to her.  She then went into the bedroom,

19   Ruiz shut the door and locked the door and stood between her

20   and the door and blocked her exit.  She was afraid if she had

21   tried to get around him that he would have harmed her.  She

22   told him repeatedly we should leave the door open, I want the

23   door open.  He said, no, that he didn't want anyone else to

24   hear what he had to say to her.  He told her that he had done

25   a lot for her that night and had kept her boy out of CPS

1    custody, and how was she going to thank him.  She said all she

2    could do was say she was very grateful, which she was.  And he

3    said, no, how are you going to thank me.  He took off his gun

4    belt and laid it on the bed near her in full view of her.  He

5    unzipped and undid his pants and exposed his penis.  He asked

6    her for oral sex and she refused.  He pressed down on her

7    shoulders to push her down and that caused pain in her

8    shoulders.  She still refused.  And at that point he pushed

9    her onto the bed, lying on the bed with her legs hanging off

10   the edge and he climbed on top of her and vaginally penetrated

11   her with his penis for approximately 15 minutes or so.  She

12   sustained pain in her leg and a bruise on her leg from

13   struggling with him.  He continued to sexually assault her

14   until there was a knock at the bedroom door unexpectedly.

15   They both quickly got dressed.  He told Victim 2 that no one

16   would believe what he had done because he was a police

17   officer.  They finally opened the door and it was Victim 2's

18   daughter's boyfriend who had come to the house and knocked on

19   the door.  Ruiz again told her that no one would believe a

20   report she made.  He said that he had many contacts in the

21   area and he could make something happen to her if he wanted

22   to.  And eventually he left and left her and the young boy at

23   the house.

24   Q    And just to clarify, Agent Whitmire, when Officer Ruiz

25   called Victim 2 back to the bedroom and she entered, he did

1    lock the door; is that correct?

2    A    That's what she said, yes.

3    Q    And did she also say that she asked him to open it and he

4    refused?

5    A    Correct.

6    Q    And that she was afraid to go around him because of the

7    presence of the weapon and the fact that he was an officer?

8    A    Yes.

9           MR. EDWARDS:  Your Honor, I just have a few more

10   followup questions.

11          THE COURT:  With her, Agent Whitmire, did they ever

12   do like with the first victim, was there any physical testing

13   done?

14          THE WITNESS:  No, sir, she came forward several

15   months after this happened.  And so, no, there was none done.

16   BY MR. EDWARDS:

17   Q    And, Agent Whitmire, can you describe, explain to the

18   Judge why it is she came forward several months after?

19   A    She saw Hector Ruiz's arrest on the TV news when he was

20   arrested for Victim 1's assault.  And she saw his picture on

21   TV and then went to the sheriff's department to make a report.

22          THE COURT:  And was there -- sorry, just a few

23   followup.  Was there corroborating -- I know you don't have

24   the physical evidence, but was there corroborating evidence to

25   substantiate that he was on the team, that he went back to her

1    house, through other witnesses you interviewed?

2              THE WITNESS:  Oh, yes, sir.  It's in that nightly

3    police report that he -- and the radio traffic that he did

4    conduct a courtesy transport.  We have his backseat video

5    footage of her and her son in his back seat.  Several family

6    members saw him there and the boyfriend of the daughter who

7    interrupted, who knocked on the bedroom door saw them both

8    there.

9              THE COURT:  Okay.  That's good.  Thank you.

10   BY MR. EDWARDS:

11   Q    Agent Whitmire, can you speak about the -- about Officer

12   Ruiz's log of the courtesy ride that night?

13   A    Yes.  He wrote what's called a, I believe, a supplemental

14   report of his activities that night.  He wrote it on the 16th

15   of August.

16   Q    And was that entry correct?

17   A    It was not correct.

18   Q    And could you explain how it was not?

19   A    On August 16th, 2019, he wrote a report that he had

20   conducted a transport on July 3rd, 2019, for Victim 2 and her

21   son, and that he had taken them to a particular address, 1210

22   Lawson (phonetic).  So the date was not July 3rd and the

23   destination was not 1210 Lawson.

24   Q    And then you talked about how Victim 2 came forward after

25   she saw news of Officer Ruiz's arrest in the media.  Has there

1    been an effort either at the State level or federal level to

2    identify more victims?

3    A    Yes, there has.

4    Q    Can you talk about that, what those efforts are?

5    A    The Fort Bend District Attorney Office had a television

6    press conference where they asked more victims to come

7    forward.  I believe the District Attorney's Office made a

8    press release upon his federal indictment, asking for more

9    victims to come forward.

10   Q    And on the federal side, since the indictment in this

11   case, have any victims come forward yet?

12   A    Not to my knowledge.

13   Q    And what is the mechanism through which they would come

14   forward?

15   A    They would call the main FBI Houston number or go to our

16   --

17            MR. MARTINEZ:  I'm going to -- All right, Judge.

18   I'm going to object to the relevance of what the mechanism is.

19            THE COURT:  I mean no one's come forward, so it's --

20   let's just move on, Mr. Edwards.

21            MR. EDWARDS:  Yes, Your Honor.

22   BY MR. EDWARDS:

23   Q    Agent Whitmire, it's correct that Officer Ruiz is on a

24   State bond; is that right?

25   A    Right.

1    Q    And he has been for the better part of a year or maybe a

2    little bit less?

3    A    Yes, sir.

4    Q    And have you spoken to his Pretrial Officer?

5    A    To his bond supervising officer, yes.

6    Q    Okay.  And what did -- did she indicate that he's been in

7    compliance?

8    A    She said he has been in compliance.

9    Q    And as far as the conditions of his bond one of those is

10   that he's not to be in possession of a weapon; is that

11   correct?

12   A    That's correct.

13   Q    And have we accounted for or is the weapon that Officer

14   Ruiz was carrying during the incidents with Victim 1 and

15   Victim 2 accounted for?

16   A    We do not have it, no.

17   Q    And do you know where that weapon is?

18   A    I believe I do.

19   Q    Okay.  And where do you believe it is?

20   A    I believe it's with a neighbor that lives directly across

21   the street from Mr. Ruiz's mother.

22   Q    And have you made any efforts through Officer Ruiz's

23   family to recover that weapon?

24   A    I contacted his mother and spoke to his sister.

25   Q    And were they cooperative in your efforts?

1    A    Not entirely, no.  The sister was translating between me

2    and his mother in the background.  I explained we wanted to

3    know where the gun was and the sister said it's with someone

4    else, but they didn't really want to tell me where it was

5    because they wanted to make sure Mr. Ruiz got it back one day.

6    Q    And can you talk about Officer Ruiz's proximity, his

7    residence, where he currently resides and how close that is to

8    the victims' residences?

9    A    He is currently living, I believe, with his mother.  And

10   that address is -- from Victim 2 it is 2.9 driving miles,

11   according to Google.  From Victim 1 it's approximately 12

12   miles to her house.

13   Q    All right.  Thank you, Agent Whitmire.

14             MR. EDWARDS:  Your Honor, I don't have any other

15   questions.

16             THE COURT:  Just one other question, and you may

17   know later, Mr. Martinez, you know -- Have you scored --

18   what's his presumptive Guideline range, Mr. Edwards, do you

19   know?

20             MR. EDWARDS:  Your Honor, I apologize.  I don't

21   remember that offhand.  I could try to look it up.

22             THE COURT:  Okay.  Mr. Martinez, do you know?

23             MR. MARTINEZ:  I haven't gotten that far ahead, Your

24   Honor.

25             THE COURT:  Okay.  Go ahead, Mr. Martinez.

1          MR. MARTINEZ:  Thank you.

2              CROSS-EXAMINATION OF MICHAEL WHITMIRE

3      BY MR. MARTINEZ:

4      Q    Agent Whitmire, if I were to consider this case a

5      transfer of that weapon to the FBI, would that be something

6      that you would be interested in?

7      A    Yes.

8      Q    And if you know where the weapon is why don't you just go

9      get a search warrant for it?

10     A    Um, well, because -- Okay.  I'm not sure where it is and,

11     honestly, this happened in the past couple of days since he

12     was arrested.

13     Q    All right.  So I want to sort of start where Mr. Edwards

14     finished off.  And you mentioned that this (audio glitch) Fort

15     Bend County State Court; is that correct?

16     A    I'm sorry, the video froze up there for a second.  Could

17     you repeat that?

18     Q    Sure.  These cases were originally filed in Fort Bend

19     County State Court; is that correct?

20     A    That's correct.

21     Q    And as it relates to Count 1 of the federal indictment,

22     the alleged Victim No. 1, that case was filed in November

23     of 2019; is that right?

24     A    Yes.

25     Q    And as it relates to alleged Victim No. 2, that case was

1    filed in December of 2019, correct?

2    A    Correct.

3    Q    And Mr. Ruiz has been out on bond in Fort Bend County

4    approximately December of 2019; is that right?

5    A    Yes.

6    Q    And as part of his conditions of release in Fort Bend

7    County, other than paying money to get out, he's under bond

8    conditions; is that right?

9    A    That's right.

10   Q    And one of those bond conditions is to report monthly to

11   a supervision officer; is that right?

12   A    I believe so, yes.

13   Q    And when you spoke with his Pretrial Officer she told you

14   that he's shown up whenever he needs to.

15   A    That's correct.

16   Q    In fact, when you arrested Mr. Ruiz in November of 2020

17   you arrested him at the Fort Bend County supervision office.

18   A    Yes.

19   Q    And the reason why it happened at the Fort Bend County

20   supervision office is that you had his Pretrial Officer call

21   him in to see her, right?

22   A    Yes.

23   Q    And whenever his Pretrial Officer called him he didn't

24   say, hey, I'm not showing up.

25   A    Correct.

1    Q    He didn't try to reschedule.

2    A    No.

3    Q    He showed up whenever she told him to; is that right?

4    A    That's right.

5    Q    In fact, the day that you arrested Mr. Ruiz, that was not

6    his scheduled day to report.

7    A    That's correct.

8    Q    You just sort of accelerated that so that you can arrest

9    him on the federal indictment.

10   A    Right.

11   Q    And did you arrest him in the parking lot?

12   A    No.

13   Q    Where did you arrest him?

14   A    In his supervision officer's office.

15   Q    Okay.  So he actually went in, went inside, checked in

16   and that's where he got arrested.

17   A    Right.

18   Q    When you arrested him did he have any, you know, multiple

19   IDs on his person?

20   A    No.

21   Q    Did he try to give you a fake name?

22   A    No.

23   Q    Did he have any one-way tickets to Mexico?

24   A    No.

25   Q    Did he have any large amounts of currency on his person?

1     A     No.

2     Q     Did he have the addresses of the complaining witnesses on

3     him?

4     A     No.

5     Q     So aside from reporting to his Fort Bend County

6     supervision officer he was also required to surrender his

7     passport; is that right?

8     A     That was a requirement, yes.

9     Q     And he did that.

10    A     I don't know.

11    Q     And he was required to use a GPS monitor.

12    A     Yes.

13    Q     He was supposed to be on a curfew.

14    A     That's right.

15    Q     He was not to contact the complaining witnesses.

16    A     That's correct.

17    Q     He was to appear in court when he needed to appear.

18    A     Yes.

19    Q     And he was on these conditions from December 2019 until

20    the present day.

21    A     Right.

22    Q     In fact, the Fort Bend County cases have not been

23    dismissed yet.

24    A     That's correct.

25    Q     Is it your understanding that the State is going to hold

MICHAEL WHITMIRE - BY MR. MARTINEZ                    37

1    on to those cases until this case is disposed of?

2    A    I don't know.

3    Q    But as of now they have not been dismissed?

4    A    That's right.

5    Q    So if the Court were to release him on bail Mr. Ruiz

6    would be under the supervision of both State Court and Federal

7    Court?

8    A    As far as I know, yes.

9    Q    And as far as you know, Mr. Ruiz showed up to his

10   supervisor when directed to.

11   A    Yes.

12   Q    He has abided by his curfew.

13   A    That's right.

14   Q    He has not attempted to contact the complaining

15   witnesses.

16   A    That's correct.

17   Q    He has not committed additional crimes while he's been

18   out on bond.

19   A    Correct.

20   Q    He's appeared in court when he's been instructed to.

21   A    That's right.

22   Q    Over the time that Mr. Ruiz has been out on bail, which

23   is approximately a year, fair to say that he's had a good

24   history of complying with his conditions of bond, right?

25   A    That is correct.

MICHAEL WHITMIRE - BY MR. MARTINEZ                    38

1    Q    Now, prior to his arrest on November 16th of 2020 -- and

2    I'm sorry if I'm getting the date wrong -- did the FBI or any

3    law enforcement agency conduct surveillance at Mr. Ruiz's

4    home?

5    A    I am not -- no.  We did not.

6    Q    But you know where he lives?

7    A    Yes.

8    Q    He lives in Rosharon, Texas; is that right?

9    A    That's right.

10   Q    He lives with his family.

11   A    Yes.

12   Q    Eight or nine people live in that house; is that correct?

13   A    I don't know.  I think he lives with his mother.

14   Q    Okay.  Have you ever been to the house or you, yourself,

15   conducted surveillance?

16   A    No.

17   Q    But detective Rangers and other law enforcement agencies

18   have?

19   A    I really don't know the answer to that.  Probably –

20   Q    Well, let me put it this way -- I'm sorry, say that –

21   A    Probably.  I believe they did.

22   Q    Okay.  And because you are -- you have now adopted this

23   case and reviewed all of the materials from the State

24   investigation, there's no report within those materials that

25   suggest that any suspicious activity is occurring at his

1    residence?

2    A    That's correct.

3    Q    Now I want to talk about -- you spoke about the

4    interrogation of Mr. Ruiz at the Manvel Police Department.  He

5    was asked to come in by a Manvel Police Detective; is that

6    correct?

7    A    I think so, yes.

8    Q    And when he showed up he had two Texas Rangers waiting

9    for him.

10   A    Yes.

11   Q    And they put him in an interview room.

12   A    Yes.

13   Q    They closed the door.

14   A    Yes.

15   Q    They didn't advise him that he had the right to an

16   attorney.

17   A    That's correct.

18   Q    They didn't advise him that he had the right to have

19   union counsel present.

20   A    That's correct.

21   Q    And that interrogation occurred over the course of two

22   hours.

23   A    Yes.

24   Q    Part of it was inside the police station.

25   A    Yes.

MICHAEL WHITMIRE - BY MR. MARTINEZ                    40

1    Q    And the other part was outside.

2    A    In a Ranger's truck, yes.

3    Q    And he was surrounded by three police officers.

4    A    I believe it was two, but, yes.

5    Q    So he had Ranger Norsworthy (phonetic), Ranger Luna

6    (phonetic) and the Manvel Police Department detective; is that

7    correct?

8    A    From my memory of the video it was -- I only remember

9    seeing the two Rangers, to the best of my memory.

10   Q    Fair enough.  And when he was moved outside he allowed

11   the Rangers to search -- to search through his phone.

12   A    Yes.

13   Q    And in November -- and this occurred in November 2019 and

14   it became apparent from their questioning that this was a

15   criminal investigation.

16   A    Yes.

17   Q    And they confronted him about some of the accusations

18   that were being made against him, right?

19   A    That's right.

20   Q    And after that meeting he was let go.

21   A    Yes.

22   Q    And after he became aware that he was the subject of a

23   criminal investigation you still found him at his house when

24   you went to go arrest him, right?

25   A    I did not arrest him at his house.

MICHAEL WHITMIRE - BY MR. MARTINEZ                    41

1    Q    When the Texas Rangers went to arrest him they found him

2    at his house.

3    A    I believe so, yes.

4    Q    And he didn't try to flee to Mexico.

5    A    No.

6    Q    And I want to talk about the arrest that happened in

7    November of 2019 by the Texas Rangers.  Like I said, he was

8    arrested at his home, right?

9    A    I have very little knowledge of that arrest, but that's

10   what I believe, yes.

11   Q    And when they arrested him they didn't find any flight

12   tickets to anywhere.

13   A    Far as I know, no.

14   Q    They didn't find multiple IDs on him.

15   A    No.

16   Q    He didn't give them a fake name.

17   A    I believe not, no.

18   Q    They didn't find his bags packed.

19   A    I don't think so.

20   Q    He cooperated with them when he was arrested; is that

21   correct?

22   A    I believe so, yes.

23   Q    After his arrest the Fort Bend County District Attorney

24   went to the press and announced these charges; is that right?

25   A    Yes.

MICHAEL WHITMIRE - BY MR. MARTINEZ                    42

1   Q    And identified Mr. Ruiz by name.

2   A    Yes.

3   Q    That he was a former officer with the Arcola Police

4   Department.

5   A    Right.

6   Q    Now, Arcola and Rosharon where he lives, those are small

7   communities; is that right?

8   A    Yes.

9   Q    And after this press conference and after his release on

10  bail he didn't try to flee the jurisdiction.

11  A    No, he didn't.

12  Q    And a way that -- a way that law enforcement and the

13  Court knew where he was at all times was with the help and use

14  of this GPS monitor, right?

15  A    Yes.

16  Q    And also this GPS monitor was sort of manufactured in a

17  way where if he went near the addresses of the complaining

18  witnesses law enforcement or the Court would be notified,

19  correct?

20  A    Correct.

21  Q    And to your knowledge Mr. Ruiz since his -- Well, let me

22  put it this way.  Since the Rangers confronted him with these

23  accusations Mr. Ruiz has not made any attempt to coerce or

24  intimidate Complaining Witness No. 1.

25  A    Not to my knowledge.

1    Q    Since the Rangers confronted him he hasn't tried to reach

2    out to Complaining Witness No. 2, right?

3    A    Not to my knowledge, no.

4    Q    I want to talk about Complaining Witness No. 1 because

5    you spent some time going over her statements.

6              THE COURT:  I don't think -- Can I cut in for a

7    second, Mr. Martinez.

8              So, Mr. Edwards, let me direct this to you and this

9    is what I'm struggling with.  That this is a serious crime and

10   this probably takes in a lot of the time I don't know if you

11   know what the Guidelines -- two different -- do you know what

12   the Guidelines are?

13             MR. EDWARDS:  Yes, Your Honor, the Guidelines got it

14   life.

15             THE COURT:  What'd you say?

16             MR. EDWARDS:  The Guidelines got it life, Your

17   Honor, according to my calculations.

18             THE COURT:  So it's a mandatory life sentence?

19             MR. EDWARDS:  No, I'm sorry, Your Honor, I thought

20   you meant -- you had asked prior --

21             THE COURT:  Oh, no, no, I don't want that.  No, I'm

22   saying what's the -- like a range that the -- yeah.

23             MR. EDWARDS:  Your Honor, the maximum is life --

24             THE COURT:  No, I know that's the maximum.  What

25   would be the -- what's the Guideline range before you get to

1    life?  There's --

2                MR. EDWARDS:  Life, Your Honor.

3                THE COURT:  Okay, so that's what I'm saying.  So

4    you're saying if he's found guilty at trial it's a life

5    sentence?

6                MR. EDWARDS:  Yes, Your Honor, that's the range.

7    Now, obviously, you know the --

8                THE COURT:  Right.

9                MR. EDWARDS:  -- the Judge can depart from that.

10   You know, anywhere up to life, Your Honor.

11               THE COURT:  So it's not like a presumptive --

12   because I haven't looked it up -- like a 100 -- I get that it

13   could be up to life, but there's not like a presumptive

14   sentence of 180 to 240 or 70 and, you know, like under the

15   Guide -- like what's his Guideline, what's the level?

16               MR. EDWARDS:  Your Honor, if you're asking if

17   there's a mandatory minimum for these offenses, I don't

18   believe so.  I believe (audio glitch).

19               THE COURT:  Let me -- let me --

20               MS. FERMIN:  Judge, if you're asking about the

21   Pretrial -- I'm sorry, the Presentence Investigation

22   Guideline?

23               THE COURT:  Yes.

24               MS. FERMIN:  Okay.  Yeah, we don't have any

25   information on that, but I just wanted to add some

1     clarification for Mr. Edwards there because I believe he's

2     looking at the statutory --

3            THE COURT:  Yeah, I'm not asking about the

4     statutory, I'm asking what would be his level and -- I mean he

5     has zero criminal history.  So what's his -- what's his -- I

6     mean I know he's a category 1, but what -- for this crime,

7     what's the level number for it?

8            MR. EDWARDS:  Oh, I'm sorry, Your Honor.  The level,

9     it's offense level -- I've got it 46.

10           THE COURT:  So that would be life.

11           MR. EDWARDS:  Yes, Your Honor.

12           THE COURT:  Okay.  Well, let me -- so this is what

13    I'm struggling with, for the both of you.  Because we have a

14    gentleman -- I get it's a very serious crime and there seems

15    to be, you know, substantial evidence at this point.  But he

16    was let out a year ago for the exact same charge on the State

17    level.  And so, we have a whole year -- a whole year of his

18    conduct on release where he's been on a curfew, he's been on a

19    GPS monitor, he's complied with all the conditions.  So it's

20    not like he's just arrested now and we're trying to predict

21    what the future will be on bond.  He has been on bond for a

22    year.  And that's why I was asking it would be one thing if,

23    you know, on the State side he was facing an estimated

24    sentence of 10 years, but if it's likely he's going to get

25    life on the federal level, that's a big difference between the

1    sentence.  And that's something for me to consider.  But

2    that's -- that's what I really -- I guess I need to know that

3    answer, Mr. Martinez.  I need to research it to figure out if

4    his presumptive offense level is going to be a 46 and life,

5    that's something, that's a big factor for me weigh.

6          Go ahead.

7          MR. EDWARDS:  Your Honor, to be clear, you know, the

8    base offense level was started at 30, but when you apply all

9    the various enhancements the Government's calculation would be

10   around the 46.

11         THE COURT:  Okay.  So if 30 is the base offense

12   level, then what -- give me the other factors that you're

13   getting up to get to a 46.

14         MR. EDWARDS:  Yes, Your Honor.  A plus-4 because the

15   offense involved force or threats, and that's 2A3.1(b)(1);

16   victim was in defendant's care, custody or supervisory

17   control, a plus-2.  The abduction is a plus-4.  And a plus-6

18   for this being an offense under color of State law.  And under

19   enhancements for obstruction, Your Honor, which we're

20   alleging, so we've got it at a 48 actually with a minus 3 if

21   he were to plead would take it down to a 45, so.

22         THE COURT:  Okay.  I hear you.

23         MR. MARTINEZ:  So --

24         THE COURT:  Go ahead, Mr. Martinez.

25         MR. MARTINEZ:  Your Honor, and all these

1    enhancements, first off, we have to have a trial.  First he

2    has to be convicted, and this is not a trial.  What the Court

3    has to weigh in this instance is whether he's a danger to the

4    community or a flight risk.  And I think he has a full year

5    worth of facts that suggest that he's not a danger to the

6    community or a flight risk.  But what I will respond to Mr.

7    Edwards' calculation is that all of these enhancements that

8    he's talking about are factual assertions that I will -- we

9    will dispute at a trial or a sentencing.  And of course the

10   Court knows that the Guidelines are merely advisory, they are

11   not mandatory.

12            MR. EDWARDS:  Your Honor --

13            THE COURT:  Everything you say, Mr. Martinez, I

14   agree with.  But one of the things I have to weigh is the

15   weight of the evidence in the case, and that's what I'm trying

16   to grapple with is what's different.  Assuming everything the

17   Government says is true, there's a difference now because of

18   the presumptive sentencing there was on the State side.  But,

19   I mean it's just something for me to consider.  And I'm saying

20   this isn't -- I don't know -- it's one of those things I don't

21   think I'm ready to rule now, it's not an easy decision because

22   it's a serious offense and you're dealing with two victims and

23   it could be a -- there's a possibility that if the Government

24   proves everything they're saying it could be a life sentence.

25   That's the difference between what's transpired over the past

1    year and the punishment versus -- so it's just not a -- it's

2    not an easy decision.  But I understand what you're saying,

3    Mr. Martinez, that weighing the last year that he's been under

4    all these conditions and he's abided by them.

5         But what's the Government's position?  I'm giving

6    you my thoughts.  Mr. Edwards, why shouldn't we say,

7    understanding that even if he's convicted, the two factors --

8    is there some condition or combination of conditions that can

9    reasonably assure his appearance or the safety of the

10   community when he's been under these onerous conditions for

11   the past year and there's no evidence he hasn't followed them.

12   Why is it different for the Government other than what I've

13   said?

14        MR. EDWARDS:  Yes, Your Honor.  Your Honor, the

15   Government is not arguing that Mr. Ruiz is a flight risk, so

16   we can take that off the table.  And what I've tried to do,

17   Your Honor, was to spend some time on the means in which Mr.

18   Ruiz executed this offense in order to show that he being a

19   law enforcement officer he understands how investigations take

20   place and he understands, you know, how to destroy, conceal.

21   And you saw that in the testimony of Agent Whitmire, Your

22   Honor, the fact that he disabled his audio system when he was

23   conducting the stops.  The fact that he took the victim

24   outside of dash cam view for several minutes, that he took her

25   to a secluded area, you know, under cover of darkness.  And

1    even with the second victim, Your Honor, the fact that he

2    used, you know, threats of deportation and her son being taken

3    to CPS, the fact that he put erroneous log entries in order to

4    cover his tracks.  And, Your Honor, with this being an offense

5    that carries a potential life sentence, the stakes are a lot

6    higher.  And Officer Ruiz has already shown that he is willing

7    to use his position in order to gain some advantage.  And in

8    this case, because of the sentence he's facing and because of

9    his proximity to the victims, Your Honor, we're very concerned

10   that, you know, given his predatory conduct that these women

11   are in danger.  And, Your Honor, we talked too about how

12   there's an effort to find other victims in this case.  And

13   also maybe not something that's, you know -- that's statutory

14   for your consideration in considering detention.  But, Your

15   Honor, you know, that really does shield the ability of other

16   victims to come forward following the federal press release if

17   Mr. Ruiz remains on the street.

18          MR. MARTINEZ:  May I respond, Your Honor?

19          THE COURT:  But we have a year.  I mean you don't

20   think -- he has a year of conduct under her view, under a GPS

21   monitor that we had other strenuous conditions to potentially

22   home confinement or not using the computer or other electronic

23   means.  But you're saying there's absolutely -- say from the

24   fact that he's already been free for a year, that there's just

25   no -- there's no combination of conditions that I can set?

1           MR. EDWARDS:  No, the Government believes that, you

2    know, given his past behavior and past ability to show efforts

3    in obstructing and concealing, that it's a, you know, we're at

4    a grave risk that, you know -- Officer Ruiz stands to lose

5    everything, Your Honor.  And if he's willing to do what he's

6    done thus far and we don't know in terms of other women out

7    there.  I mean he's showed a pattern that, you know, kind of

8    is predicative of other activity that we might not know about.

9    The Government, Your Honor, is not willing to recommend to you

10   other conditions.  We stick to our guns that detention is the

11   most appropriate in a case of this severity.

12          THE COURT:  Go ahead, Mr. Martinez.  All right.  The

13   floor is yours.

14          MR. MARTINEZ:  Thank you, Your Honor.  I haven't

15   even got into my cross of these allegations, so that will be

16   disputed.  And there's, in my opinion, sufficient evidence to

17   cast doubt on these allegations.

18          Secondly, about the risk of him going to prison,

19   take a look, we have the steps that we have taken this morning

20   to protect Mr. Ruiz's safety.  We have cleared the courtroom

21   so that other defendants are not made aware of these

22   allegations.  He was facing these very same allegations in

23   State court, so the threat that he -- the potential threat

24   that he had if he were convicted and gone to prison, you know,

25   he might lose his life on these types of allegations.  So that

1   fear and threat was there from a very long time ago for a man

2   who's in his late 20s and has no criminal history.  The threat

3   was very real in State court.

4           The other thing is, well, he's not a police officer

5   anymore.  He doesn't have access to these things that the

6   Government says that could tamper with evidence or anything

7   like that.  And I think that that, you know, if the Government

8   was really concerned about danger to the community, this

9   investigation was done in December of 2019.  They could have

10  -- if this was a real fear of danger to the community they

11  would have indicted him in December or January of 2020.  So,

12  while I appreciate my colleague's argument I just don't think

13  that that's very credible.

14          The other thing, too, is that they indicted Mr. Ruiz

15  on November 10th of 2020, and they let him go six days until

16  he was arrested on November 16, 2020.  So this idea that

17  there's a danger to the community -- we'll establish the case

18  that they arrested him right when they indicted him.

19          And, you know, about these future victims, Fort Bend

20  County made a press release when he got arrested in November

21  of 2019 and this one alleged victim that came forward in the

22  span of a whole year.  You know, there's not this pool of

23  people out there that are waiting to make allegations against

24  Mr. Ruiz, because if they were they would have come forward.

25          And, you know, from our position is, you know, if you

1     want to put him in home confinement, you know, we're agreeable

2     to that.  And, you know, GPS monitoring and everything else

3     that has been in place since his release on December 2019, I

4     think would be sufficient to ensure the safety of the

5     community.

6             THE COURT:  So let me do this, Mr. Martinez.  We

7     still have the rest of the docket that I've got to get to.

8     I'm not going to make a decision.  I want you to go and finish

9     your cross on the Agent.  So, we're going to have to -- we're

10    going to have to continue this till -- we're going to have to

11    continue this till tomorrow to get this done.

12            MR. MARTINEZ:  Judge, so my wife is 37 weeks

13    pregnant.

14            THE COURT:  Okay.

15            MR. MARTINEZ:  And she is -- we have our appointment

16    tomorrow at noon and I would hate to miss that.

17            THE COURT:  No, you're not going to miss that.  So

18    let's -- I don't want you to have to deal with this tomorrow.

19    I mean -- I mean it was going to take me a few days to think

20    about this.  It's a tough decision.  Can we -- I know it's

21    Tuesday, but then we have the holiday on Thursday.  I know

22    it's not everybody's first choice to be dealing with this on

23    Friday.  Mr. Martinez, is it okay if we continue this to next

24    Monday?

25            MR. MARTINEZ:  Yeah.  And that's fine, Judge,

1     because I have about three or four witnesses that I want to

2     put up.

3             THE COURT:  Okay.

4         (Court and counsel speaking simultaneously.)

5             THE COURT:  Yes.  And we definitely -- okay.  Well,

6     let's -- I'm just trying to give you a date because I'm on

7     duty and so I just don't want to be wasting everybody's time

8     sitting around with -- I'm trying to think of a time certain.

9     The afternoon is probably better that weekday.  Are you

10    available on Monday, Mr. Edwards and Mr. Whitmire -- Agent

11    Whitmire?

12            MR. EDWARDS:  Yes, Your Honor.

13            AGENT WHITMIRE:  Yes.

14            THE COURT:  So I think we should be ready at 3:00 on

15    Monday, and that way we can just go till we're done and there

16    will nothing else behind us.  If it's going to get delayed

17    till 3:30, we'll let you know.  But let's plan on 3:00

18    o'clock.

19            MR. MARTINEZ:  Very well, Judge.

20            THE COURT:  Mr. Ruiz, this is, you know, a serious

21    case, a serious decision that I have to make.  I don't take it

22    lightly.  I want to be fair to all sides and give your

23    attorney -- you've heard some of my concerns and the questions

24    that I asked.  I have not made up my mind about what to do;

25    it's just something I want to think about.  But I want to give

1    your attorney the right to finish the presentation of his

2    case, and if the Government has anything else.  So we're going

3    to continue you till -- for good cause till Monday at --

4    Monday is the 30th at 3:00 p.m.

5              Anything else, Mr. Martinez?

6              MR. MARTINEZ:  No, Your Honor.  The only thing is

7    that he hasn't had a chance to make a phone call to his family

8    because he's in quarantine.  I know that's probably out of

9    your hands, but --

10             THE COURT:  Yeah, we're really facing -- So what

11   would be easier, because I don't have any control on that, the

12   whole pandemic.  And since he's represented through you now,

13   that you could talk to his family and let him go because when

14   we start messing with things that we don't have jurisdiction

15   over, it just creates (audio glitch) stay in my line in what

16   I'm doing.  So if you could communicate to his family.

17             Is his family on now?  I see family members I don't

18   know.

19             MR. MARTINEZ:  Yeah, there's about six or seven

20   family members.

21             THE COURT:  Okay.  His family sees what's going on

22   and they can hear me and I can see them, and so, okay.

23             So, okay.  So we'll see you all at 3:00 o'clock next

24   Monday, November 30th.

25             MR. EDWARDS:  Yes, Your Honor.

1        MR. MARTINEZ:  Thank you, Your Honor.

2        THE COURT:  Thank you.

3        MR. EDWARDS:  Thank you, Your Honor.

4      (Proceeding concluded at 12:18 p.m.)

5                         * * * * *

6        *I certify that the foregoing is a correct transcript*

7  *to the best of my ability due to the condition of the*

8  *electronic sound recording of the ZOOM/telephonic proceedings*

9  *in the above-entitled matter.*

10    */S./   MARY D. HENRY*

11  *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

12  *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

13  *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

14  *JTT TRANSCRIPT #63327*

15  *DATE FILED:  JANUARY 31, 2021*

16

17

18

19

20

21

22

23

24

25