IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | CASE NO. 4:20-cr-00582-1 |
| | § | HOUSTON, TEXAS |
| VERSUS | § | MONDAY |
| | § | NOVEMBER 30, 2020 |
| HECTOR AARON RUIZ | § | 3:53 P.M. TO 5:38 P.M. |

<u>ARRAIGNMENT AND DETENTION HEARING (CONTINUED)</u>
<u>(VIA ZOOM)</u>

BEFORE THE HONORABLE SAM SHELDON
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:                    SEE NEXT PAGE

ELECTRONIC RECORDING OFFICER:   JACQUELINE MATA

CLERK:                          SHANNON JONES

<u>TRANSCRIPTION SERVICE BY</u>:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 ELDRIDGE ROAD, #144
SUGAR LAND, TEXAS 77478
(281) 277-5325 (office)
www.judicialtranscribers.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

APPEARANCES (VIA ZOOM):


FOR THE GOVERNMENT:              U.S. ATTORNEY'S OFFICE
                                 Sebastian Edwards, Esq., AUSA
                                 1000 Louisiana, Ste. 2300
                                 Houston, Texas  77002
                                 713-567-9503


FOR THE DEFENDANT               Javier O. Martinez, Esq.
HECTOR AARON RUIZ:              Attorney at Law
(VIA ZOOM)                       712 Main St., Ste. 2400
                                 Houston, Texas  77002
                                 713-228-8500

<u>INDEX</u>

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| MICHAEL WHITMIRE | | | | |
| By Mr. Martinez | | 6 | | 44 |
| By Mr. Edwards | | | 35 | |
| AMY RUIZ | | | | |
| By Mr. Martinez | 46 | | | |
| By Mr. Edwards | | 50 | | |
| ELIZABETH FLORES | | | | |
| By Mr. Martinez | 53 | | | |
| By Mr. Edwards | | 55 | | |

| EXHIBITS: | Marked | Offered | Admitted |
|---|---|---|---|
| Defendant's #1 - #7 | 57 | 57 | 58 |

<u>HOUSTON, TEXAS; MONDAY, NOVEMBER 30, 2020, 3:53 P.M.</u>

THE COURT: Okay. Good afternoon. I don't think we need a translator, right, Mr. Martinez?

MR. MARTINEZ: Correct, Your Honor. We don't need a translator.

THE COURT: Mr. -- we don't need a translator.

INTERPRETER: Thank you, Your Honor.

THE COURT: So 20-582, Hector Aaron Ruiz. Is that you, sir?

DEFENDANT RUIZ: Yes, Your Honor.

THE COURT: And you're here with your attorney Javier Martinez. Mr. Edwards is here on behalf of the Government. Normally we would conduct this hearing in person, all of us in the courtroom together, but because of the pandemic it's not safe for all of us to be in the courtroom together, so we're -- with your permission, Mr. Ruiz, we can do this hearing by video. Do we have your permission?

DEFENDANT RUIZ: Yes, Your Honor.

THE COURT: And Mr. -- before we even get started, Mr. Martinez, it's all well with your pregnant wife?

MR. MARTINEZ: Yes, Your Honor. Thanks for checking. We're just sort of waiting now.

THE COURT: Okay.

So this is where we were at before. We heard from Mr. Whitmire on direct. Mr. Edwards had laid out his case

1    according to detention.  Mr. Martinez, you were getting into

2    your cross.  You hadn't really got into the substance of the

3    case that were getting into the other factors, either danger

4    to the community or flight risk.  So let me -- Let me just go

5    back on one other thing.  I had some questions that I thought

6    of, but I'll let you finish your cross, Mr. Martinez.

7        Mr. Edwards, you told me before that he started with

8    the offense level of 30.  So is that correct that you scored

9    him with an offense level of 30?

10        MR. EDWARDS:  Yes, Your Honor.  Yes, that's correct.

11        THE COURT:  And then with -- with all the

12   enhancements he could end up with a life sentence.  As to two

13   counts with the 924©, if he was found guilty of the counts

14   related to 924©, what would be his mandatory sentence before

15   we even get into related as 924©?

16        MR. EDWARDS:  Your Honor, is that before the

17   application of 924© -- mandatory sentence?

18        THE COURT:  Yeah, what would be his mandatory -- No,

19   with the 924© meaning that would carry a mandatory because

20   it's a 924© as to both counts.  What would be his mandatory

21   sentence before you even got into the other offenses?

22        MR. EDWARDS:  Your Honor, it's just a mandatory

23   minimum of five years for 924©.

24        THE COURT:  And with those the facts, so it's five

25   and five?  Does each incident result in a five-year, mandatory

1    five-year sentence?

2              MR. EDWARDS:  Yes, Your Honor.

3              THE COURT:  Okay.  So if he was convicted on those

4    two it would start with 10 plus whatever, it would be a

5    consecutive sentence of whatever else, whatever comes first,

6    plus the 10 years?

7              MR. EDWARDS:  Your Honor, that's my understanding.

8    Yes, Your Honor.

9              THE COURT:  Okay.

10             Okay, go ahead, Mr. Martinez.

11             Agent Whitmire, you're still under oath.  And it's

12   all yours, Mr. Martinez.

13        (Audio glitch).

14             MR. MARTINEZ:  Okay, can you hear me now?

15             THE COURT:  Yes.

16             MR. MARTINEZ:  Okay.  Thank you.

17         CROSS-EXAMINATION OF MICHAEL WHITMIRE (Resumed)

18   BY MR. MARTINEZ:

19   Q    Agent Whitmire, I'm going to sort of start off where I

20   left off last week.  And I want to talk about the Texas

21   Rangers investigation.  And as part of their investigation

22   they reviewed Mr. Ruiz's employment file from Arcola Police

23   Department, correct?

24   A    Yes.

25   Q    And within his employment file there were no other prior

1    instances of misconduct, right?

2    A    Correct.

3    Q    There was no prior citizen complaints about sexual

4    harassment.

5    A    Correct.

6    Q    There were no prior citizen complaints about excessive

7    force.

8    A    Right.

9    Q    As part of the investigation that law enforcement

10   conducted they also interviewed some of his co-workers at the

11   Arcola Police Department, correct?

12   A    I believe that's true, yes.

13   Q    I believe that you interviewed one witness; is that

14   right?

15   A    His sergeant, yes.

16   Q    And as part of the investigation into Mr. Ruiz his

17   employment file did not have any other prior instances of

18   inappropriate behavior in the workplace, correct?

19   A    That's right.

20   Q    There was no prior allegations of sexual harassment in

21   the workplace.

22   A    Right.

23   Q    There was no prior allegations that he was insubordinate.

24   A    Correct.

25   Q    In fact, the sergeant that you interviewed is female,

1    right?

2    A    Yes.

3    Q    And she didn't sort of tell you that she felt

4    uncomfortable around Mr. Ruiz.

5    A    That's right.

6    Q    She did not allege that Mr. Ruiz was inappropriate with

7    her.

8    A    She did not.

9    Q    And she did not, you know, tell you that he was

10   aggressive or violent or short-tempered, correct?

11   A    Correct.

12   Q    I think she said that he was kind of quiet; is that your

13   recollection?

14   A    Yes.

15   Q    You're familiar with the indictment in this case,

16   correct?

17   A    Yes, sir.

18   Q    I want to talk about some of the things that the Court

19   mentioned right now, and that's Count 3 and Count 5 which

20   relates to the firearm offenses.

21   A    Yes.

22   Q    As it relates to those Counts there's no allegation that

23   Mr. Ruiz ever pointed a weapon at either one of these women,

24   right?

25   A    Right.

1    Q    There's no allegation that he told them that he was going

2    to shoot them.

3    A    Correct.

4    Q    There's no allegation that he told them that he was going

5    to kill them.

6    A    Right.

7    Q    (Audio glitch) going to hit them with the weapon.

8    A    Right.

9    Q    In fact, if I remember your testimony correctly, both of

10   these complaining witnesses stated that he took off his belt

11   during the alleged sexual assault, correct?

12   A    Yes.

13   Q    As it relates to the dash cam and, more specifically,

14   Count 2 of the indictment which relates to, you know,

15   destruction, alteration or falsification of records in federal

16   investigations, it's what's sort of commonly known as

17   obstruction of justice count, right?

18   A    Yes.

19   Q    And you were able to review the dashboard camera from the

20   November 16, 2019, incident, correct?

21   A    Yes.

22   Q    And Mr. Ruiz didn't destroy that tape.

23   A    No.

24   Q    He didn't tape over the traffic stop.

25   A    No.

1   Q    He didn't delete the footage.

2   A    No.

3   Q    When the Texas Rangers confronted him with these

4   allegations, nothing happened to that tape.  You were able to

5   retrieve it; is that right?

6   A    Arcola PD retrieved it, yes.

7   Q    Oh.  And then gave it to law enforcement -- investigate.

8   A    Yes.

9   Q    You mentioned on your direct testimony you talked about

10  the supplement report that Mr. Ruiz wrote that related to

11  Complaining Witness No. 2 and the ride that he gave her to her

12  home.  Do you recall that?

13  A    Yes.

14  Q    And -- Sorry?

15  A    No -- nothing here.

16  Q    Oh, okay.  And you mentioned that it had a wrong date on

17  the supplement report.

18  A    That's right.

19  Q    And that report was written by Mr. Ruiz.

20  A    Yes.

21  Q    That report, although it had the wrong date, it had the

22  name of the Fort Bend County Deputy who he assisted.

23  A    Yes.

24  Q    And said how he assisted him.

25  A    Yes.

1    Q    And had the name of the alleged Complaining Witness

2    No. 2.

3    A    Yes.

4    Q    It had her date of birth.

5    A    Yes.

6    Q    It had her son's name and his date of birth.

7    A    Yes.

8    Q    In fact, his supplement referenced the Fort Bend County

9    Police Report, right?

10   A    Yes.

11   Q    And it had that police report number, correct?

12   A    I believe that's correct.

13   Q    So that if anybody could -- if anybody had any questions

14   about what he did, they could have referenced that Fort Bend

15   County Police Report, right?

16   A    Yes.

17   Q    So the only thing that was, I guess, incorrect on the

18   supplement was the date, but everything else was accurate.

19   A    I believe the date and the destination address was

20   incorrect.

21   Q    Are you talking about 1210 Lawson, Rosharon, Texas?

22   A    Yes.

23   Q    Do you have a copy of the Fort Bend County reports?

24   Because I'm showing something different.

25   A    I -- no, I don't believe.  I don't have a copy of the

1  Fort Bend County report.

2  Q    Oh, but you have a copy of the Ranger's report.  And on

3  page 28 of 49 the Ranger references 1210 Lawson, Rosharon,

4  Texas, which is the same date that's written on Mr. Ruiz's

5  supplement.  Do you have any reason to dispute that?

6  A    I was referencing the correction to the supplement made

7  by Officer Ruiz's sergeant, Sergeant Carr.  She corrected the

8  destination address.

9  Q    All right.  Let's talk about November 19, November 2019

10  which is the first alleged sexual assault.  That complaining

11  witness was interviewed by several different law enforcement

12  agents, right?

13  A    Yes.

14  Q    And I want to talk about her statements to law

15  enforcement.  The prosecutor referenced, started out with

16  saying how the night got started.  One of the things that he

17  did not mention was that the complaining witness told

18  investigators that she started smoking marijuana around 6:00

19  p.m., right?

20  A    I'm not -- I don't honestly remember the time she said

21  she had smoked it.  It was earlier in that day.

22  Q    Okay.  We'll leave it at that.  And after she had smoked

23  marijuana she drove to go pick up her friend, right?

24  A    Yes.

25  Q    They went to go buy a bottle of tequila and then went

1    over to the Seaside Lounge, right?

2    A    Right.

3    Q    They didn't drink much inside the club, but the

4    complaining witness would go outside and take shots of the

5    bottle of tequila that they had purchased, correct?

6    A    Yes.

7    Q    And after leaving that club they tried to go to another

8    club or they drove to another club, right?

9    A    They were going to drive to another club, yes.

10   Q    And on the ride over to that club the complaining witness

11   fell asleep in the car.

12   A    Yes.

13   Q    Then they drove back to her friend's house; is that

14   correct?

15   A    Yes.

16   Q    Her friend tried to convince her to stay there --

17   A    Yes.

18   Q    -- right?  And the complaining witness did not listen to

19   her.

20   A    Right.

21   Q    And she drives away from her friend's house and this is

22   where the initial encounter with Mr. Ruiz occurred, correct?

23   A    Yes.

24   Q    From the dashboard camera and the Manvel Police

25   Department report you could -- they reference that she was

1  going 56 miles per hour in a 40-mile-per-hour zone, correct?

2  A    I think so, yes.

3  Q    So she was -- Mr. Ruiz was attempting to stop her for

4  speeding, correct?

5  A    That's what he told the victim, yes.

6  Q    Okay.  But she was speeding, correct?

7  A    I --

8        THE COURT:  Did you say 6 miles in a 40-mile or did

9  you -- what was the speed you referenced --

10       MR. MARTINEZ:  I'm sorry, 56 miles per hour in a 40-

11  mile-per-hour zone.

12       THE COURT:  Okay.  Okay, got it.  Got it.

13  BY MR. MARTINEZ:

14  Q    And the complainant told law enforcement that she didn't

15  pull over because she didn't think she was speeding.

16  A    That's what she said, yes.

17  Q    And she did not pull over immediately, right?

18  A    Right.

19  Q    She runs a stop sign.

20  A    Yes.

21  Q    In fact, it was about 3.5 miles from the point that Mr.

22  Ruiz tried to detain her to the point where she stopped,

23  correct?

24  A    It was about 4 minutes.  I haven't measured it out.

25  Q    Okay.  Well, do you have any reason to dispute the Manvel

1    Police Department report that says that she -- that this

2    person did not stop for Mr. Ruiz for approximately 3.5 miles?

3    A    No reason to dispute it.

4    Q    And in fact, the complaining witness told you that she

5    didn't think that she was being detained, right?

6    A    She -- I don't understand your question.  She was clear

7    she was being pulled over eventually.

8    Q    Right.  But the reason that she told you that she didn't

9    stop immediately was because she didn't think that she was

10   being stopped, right?

11   A    Yes.  She did not think he was trying to stop her.

12   Q    But actually when you review the dash cam video from

13   Officer Ruiz, Officer Ruiz is trying to get her attention,

14   right?

15   A    Yes.

16   Q    I mean he pulls up next to her, right?

17   A    Yes.

18   Q    Flashes his lights.

19   A    Yes.

20   Q    So it's clear that she's (audio glitch).  So she finally

21   pulls over and an interaction occurs between the two of them,

22   right?

23   A    Right.

24   Q    And, you know, she drives away and Ruiz goes in front of

25   her or behind -- or is he behind her?

1    A    He's initially in front of her.

2    Q    Okay.  And during -- after that first detention the

3    complaining witness didn't call 911.

4    A    No.

5    Q    She didn't ask her friend to call 911.

6    A    No.

7    Q    She didn't ask her mom to call 911.

8    A    No.

9    Q    So she gets stopped a second time and another interaction

10   occurs between Mr. Ruiz and the complaining witness, right?

11   A    Right.

12   Q    And after that second interaction the complaining witness

13   has her phone on her, right?

14   A    Yes.

15   Q    And she doesn't call 911.

16   A    No.

17   Q    She doesn't ask her friend to call 911.

18   A    No.

19   Q    She doesn't ask her mom to call 911.

20   A    No.

21   Q    She herself doesn't call 911.

22   A    No.

23   Q    Eventually they end up at sort of some houses that are

24   being built.  Is that a fair statement?

25   A    Yes.

1    Q    And we're talking about -- and I'm just referencing the

2    Ranger's report and the video -- some time between 2:45 and

3    3:29 a.m. when both vehicles are stationary, right?

4    A    Yes.

5    Q    And this is when the complaining witness says that the

6    alleged sexual assault occurred, right?

7    A    Right.

8    Q    At 3:29 she gets back into her vehicle and she drives

9    off, correct?

10   A    Yes.

11   Q    But then she stops.

12   A    Yes.

13   Q    She comes back to Mr. Ruiz's vehicle.

14   A    Yes.

15   Q    During your direct testimony you testified that the

16   complaining witness was crying the whole time while this was

17   allegedly occurring, correct?

18   A    She told us she was crying the whole time she was with

19   him.

20   Q    And that she was scared.

21   A    Yes.

22   Q    So here we have a situation where the complaining witness

23   describes this assault and she's scared, but yet she stops her

24   vehicle voluntarily and comes back to Mr. Ruiz's vehicle,

25   right?

1   A     Right.

2   Q     Does she go home after that?

3   A     She did go home, yes.

4   Q     But she didn't stay home, did she?

5   A     No.

6   Q     She went to go meet up with a guy that she met on

7   Instagram.

8   A     Correct.

9   Q     This was at 4:00 in the morning.

10  A     Yes.

11  Q     She goes over to his house.

12  A     Yes.

13  Q     Smokes marijuana with him, right?

14  A     She might have.  I honestly can't remember.

15  Q     Okay.  That's fair.  So in fact she lied to her mom about

16  staying at home, right?

17  A     I think so, yes.

18  Q     So here we have, you know, she has described this, you

19  know, horrific assault and instead of staying home she goes

20  and meets up with some other male to smoke marijuana, right?

21  A     Yes.

22  Q     Law enforcement spoke with her parent, is that right?

23  A     Yes.

24  Q     And law enforcement learned that the parent had placed a

25  tracker on her phone, right?

1    A    It was some type of tracking software that -- on her

2    phone, yes.

3    Q    And they did this because she would get too drunk and

4    black out.

5    A    I don't remember that testimony.

6    Q    Do you have a copy of the Manvel Police Department

7    report?

8    A    Unfortunately, not.  I don't believe I do.

9    Q    Do you have any reason to dispute that the complaining

10   witness's mother told law enforcement that they put a tracker

11   on her phone because she would black out?

12   A    No reason to dispute.

13   Q    After she reported this incident they had her undergo

14   what's commonly referenced as a staining analysis, right?

15   A    Yes.

16   Q    And this is where she goes to the hospital, meets with a

17   nurse and they do an examination of, you know, her genitals

18   and body; is that right?

19   A    Right.

20   Q    And there were no signs of trauma found on her vagina,

21   right?

22   A    Correct.

23   Q    Or her anus.

24   A    Yes.

25   Q    There was no bruising on her body other than some scratch

1   that she said somebody else made, correct?

2   A    Yes.

3   Q    All right.  Let's talk about the complaining witness --

4            THE COURT:  Can I -- Mr. Martinez.  Can I just ask

5   for clarification.  So this -- the alleged (audio glitch)

6   occurred on (silence - no audio) that was the date referenced

7   in the indictment.

8            MR. MARTINEZ:  I'm sorry, Your Honor.  I didn't catch

9   your question.

10           THE COURT:  Yeah.  The incident that you were just

11  referencing, what date did that incident allegedly happen?  Was

12  it November 16, 2019?

13           MR. MARTINEZ:  That's correct, Your Honor.

14           THE COURT:  And what date did she -- it get reported

15  -- so when we say we're talking about morning hours of events

16  occurring, were those morning hours November 16th or were those

17  on November 15th?

18           MR. MARTINEZ:  Agent Whitmire can correct me if I'm

19  wrong, but I believe it's early morning hours of November 16th.

20  And I believe it was reported either later on that morning or

21  that afternoon.

22           THE WITNESS:  That's correct.

23           THE COURT:  And who reported it?  Was it her or her

24  parents?

25           THE WITNESS:  I'm sorry, who's being questioned here?

1    I don't know.

2              THE COURT:  I'm sorry, Agent Whitmire --

3              THE WITNESS:  Oh, okay.

4              THE COURT:  -- you're the one that's actually

5    providing evidence, so --

6              THE WITNESS:  Oh, okay, okay.  Yes, she came into the

7    Manvel Police Department with her mother and her father.

8              THE COURT:  Okay.  So the same day it was reported.

9              THE WITNESS:  Yes, sir.

10             THE COURT:  And then you referenced that the alleged

11   assault took place sometime between 2:45 and 3:29 a.m.  And

12   then she drives off, but then drives back to Officer Ruiz?

13             THE WITNESS:  Well, she stopped.  He pulled up behind

14   her and she got out of her car and walked to his car.

15             THE COURT:  Okay, I got you.  So she drives off after

16   the incident and then he pulls up behind her, she stops again

17   and then goes back to his car?

18             THE WITNESS:  Yes, Your Honor.

19             THE COURT:  Okay.  So it wasn't like she left and

20   then drove back to his car?

21             THE WITNESS:  No, sir, she parked and then got out

22   and walked to his car.

23             THE COURT:  Okay.  And then how long was she at his

24   car on that final stop; do we know?

25             THE WITNESS:  I would say a minute or less.

1            THE COURT:  Okay.  And did anybody ever ask her why

2      she stopped and got out of her car to go back to his car on

3      that final --

4            THE WITNESS:  Yes, sir.  I believe he still had her

5      license.

6            THE COURT:  Okay.

7            THE WITNESS:  I think she also said she tried to get

8      his name or phone number in an effort to identify him.

9            THE COURT:  Okay.  And then what was the physical

10      evidence that was found?  You referenced on your direct again,

11      so I understand the sequence of that.  What was -- was semen

12      found on her body, on her clothing?  His semen found on her

13      clothing?

14            THE WITNESS:  Yes, sir, his sperm cells were found in

15      the crotch area of her jeans.

16            THE COURT:  Okay.  The theory is -- that the assault

17      is the -- I'm trying to think of the word.  The assault was the

18      oral act that you described on your direct.  She's not saying

19      that there was -- in this case, the second victim there was, in

20      this case there wasn't any penetration?

21            THE WITNESS:  The victim is not alleging that, no,

22      sir.

23            THE COURT:  Okay.  Okay.  So, and, Mr. Martinez, is

24      there -- so there's no -- is there any dispute that his sperm

25      was found on her jeans?

1           MR. MARTINEZ:  Yeah, I was --

2           THE COURT:  Go ahead.

3           MR. MARTINEZ:  I would have to consult with a DNA

4     expert at this point.  But that's certainly something that we

5     will look at as this case moves forward.

6           THE COURT:  Okay.  Okay, I need to have -- again what

7     I'm -- what I'm -- the quagmire in that case is there's no

8     burden on you as to the trial, but one of the factors is I need

9     to weigh -- weigh the strength of the Government's case.  Is it

10    your theory, and you don't have to answer my question, but is

11    your theory that what happened between 2:45 and 3:29 a.m. that

12    that was consensual?  That something -- whatever happened was

13    consensual?  Or is your theory that nothing happened?

14          MR. MARTINEZ:  Well, as far as at this point, and I'm

15    certainly not committing to any sort of position at trial, but

16    I believe that Agent Whitmire's testimony was that Mr. Ruiz --

17    or at least from the evidence that I've gathered is that Mr.

18    Ruiz told the Rangers that this was consensual.

19          THE COURT:  Okay.  And I didn't want to reference

20    that because I know that there's -- you have a potential --

21    well, I figured to file a motion, based on what you were

22    saying, that you were going to file a motion to suppress that

23    evidence.  And so, I didn't want to get into really what he

24    said.  But, okay, understood now.

25          MR. MARTINEZ:  It's a long road ahead, from what I

1    can gather, as far as potential defenses and exploring all

2    avenues of defense.

3            THE COURT:  Right.  And is there -- I mean I know --

4    is there even -- I don't know the case on this, but can someone

5    that's pulled over in -- like in those circumstances, as a

6    matter of law can they even consent?

7            MR. MARTINEZ:  Well, I was -- you're asking these

8    questions.  I actually have the juror -- Fifth Circuit Jury

9    Pattern Instructions for depravation of civil rights.  And as

10   far as I'm concerned, you know, from what I'm reading and the

11   way that the Government has pled this case, from what I'm

12   gathering from the Fifth Circuit Jury Pattern Instructions is

13   that a person commits aggravated sexual abuse if the defendant

14   knowingly causes another person to engage in a sexual act by

15   using force against that other person or by threatening or

16   placing that other person in fear that any person would be

17   subjected to death, serious bodily injury or kidnapping.  So

18   that's sort of what I'm getting from the Fifth Circuit Pattern

19   Jury Instructions at this point.  So I think that the

20   Government has to prove use of force.  And whether that's

21   implied or not, that's something that, you know, we'll get to

22   the bottom of.

23           THE COURT:  Okay.  And is there a lesser -- because

24   this is all viewed -- yeah, I mean I think all of us are

25   dealing with, you know, a case that's not a garden variety

1    federal crime to deal with.  Is there a lesser included

2    offense, Mr. Edwards?

3              MR. EDWARDS:  Your Honor, the aggravated assault

4    aspect of this is it enhanced or there is a lesser offense of

5    violating an individual's right to bodily integrity.  And if

6    the Government proves bodily injury and not any type of

7    aggravated sexual abuse, then it's just a lesser threshold

8    sentence, Your Honor.

9              THE COURT:  Okay.  But on the fist victim there's no

10   allegation -- obviously, there's psychological, but there's no

11   -- my understanding there's just what Agent Whitmire said,

12   there's no physical injury as to the first victim, but there is

13   as to the second one?

14             MR. EDWARDS:  That's correct, Your Honor.  And, you

15   know, the way we charged it was not that -- you know, not that

16   there was an actual -- an actual, you know, aggravated physical

17   act, but rather putting the victim "in fear of," it also says.

18             THE COURT:  Sorry.  Go ahead.

19             MR. MARTINEZ:  I think the indictment says this act

20   included aggravated sexual abuse and kidnapping.

21             MR. EDWARDS:  Right.  Right, but, Your Honor, when

22   you look at the definition of aggravated sexual abuse it

23   includes, you know, the psychological aspect, putting the

24   victim "in fear of" and not necessarily that it occurred.

25             THE COURT:  And if it -- you know, if it plays out

1     that the defense is or -- you know, on a consent defense,

2     obviously that would negate the fear aspect of it.

3              And I'm not asking either one of you to commit to any

4     position, but now I'm just struggling with deciding this bond

5     issue.  So whatever you tell me, Mr. Martinez, Mr. Edwards, I

6     don't want the other side to say, look, at this bond hearing

7     you said A, B and C, and you're stuck with that position at

8     trial or sentencing.  It was so early on that I'm not looking

9     to -- either one of you certain conditions.

10             Okay.  Go ahead, Mr. Martinez.

11    BY MR. MARTINEZ:

12    Q    Agent Whitmire, I'm going to move on to the second

13    allegation that was alleged to have occurred on August 11th

14    of 2019.  And this sort of started when the second complaining

15    witness's boyfriend, I believe, was pulled over at Fort Bend

16    County for DWI; is that right?

17    A    Yes.

18    Q    And Mr. Ruiz was called to the scene so that he could help

19    translate for the people that were detained, correct?

20    A    Yes.

21    Q    So it was their request.  It's not like he showed up, you

22    know, voluntarily or anything like that.

23    A    I believe they requested his help, yes.

24    Q    And when Mr. Ruiz arrived at the scene the second -- this

25    complaining witness was being disruptive with the investigation

1    that Fort Bend County was conducting, right?

2    A    She was not completely following their instructions.

3    Q    And in fact, the Fort Bend County Sheriff's Officers asked

4    Mr. Ruiz to detain this individual and put her in the back of a

5    unit, correct?

6    A    Yes.

7    Q    And when she was put inside of that unit she began kicking

8    the police car, right?

9    A    Yes.

10   Q    Mr. Ruiz came over and spoke with her and told her to calm

11   down, right?

12   A    Yes.

13   Q    He wasn't rude to her.

14   A    No.

15   Q    In fact, he was trying to help her.

16   A    I don't know what his intentions were.  He was telling her

17   to calm down.

18   Q    Okay.  When you were testifying on direct you stated that

19   the complaining witness said that Mr. Ruiz threatened her with

20   CPS, right?

21   A    Yes.

22   Q    And the other officers wanted to take her son away from

23   her, correct?

24   A    Yes.

25   Q    And those interactions between Mr. Ruiz and this

1    complaining witness were recorded.

2    A    Some of them.

3    Q    And -- Well, in the recorded conversations, which include

4    when he would go over and talk to her inside of the unit, he

5    never mentioned anything about CPS, right?

6    A    As far as I know, yes.

7    Q    In fact, he told her that the police were there to arrest

8    her boyfriend, not her.

9    A    Right.

10   Q    Then, you know, they asked him to take her over to the

11   house, her house or her boyfriend's house and this is where you

12   testified that the alleged sexual assault happened, right?

13   A    At the boyfriend's house, yes.

14   Q    Her son was inside of the house when this alleged incident

15   occurred, right?

16   A    Yes.  Yes.

17   Q    And -- I'm sorry.  He was interviewed at the Children's

18   Assessment Center, correct?

19   A    Yes.  Yes.

20   Q    When he was interviewed at the Children's Assessment

21   Center he did not say that he heard weird noises coming from

22   the bedroom, right?

23   A    Right.

24   Q    He did not say that he heard yells from the bedroom.

25   A    Right.

1    Q    He did not say that he heard calls for help.

2    A    Yes.  Correct.

3    Q    He did not say that his mother came out crying from the

4    bedroom.

5    A    Right.

6    Q    (Audio glitch) injuries on her body.

7    A    You broke up.  Could you repeat that?  I'm sorry.

8    Q    Yeah.  I'm sorry.  He did not say that she had any visible

9    injuries on her body or that her hair was messed up or that her

10   makeup was all over the place.

11   A    Right.

12   Q    Did you or any other member of law enforcement interview

13   Estaban Cano (phonetic)?

14   A    Yes, I did.

15   Q    You make a 302?

16   A    Yes.

17   Q    He didn't say anything that the complaining witness was

18   crying, right?

19   A    Right.

20        THE COURT:  Who is "he"?

21        MR. MARTINEZ:  I'll put into context.  I'm sorry.

22   BY MR. MARTINEZ:

23   Q    Mr. Cano is the individual who came back to the house and

24   saw that Mr. Ruiz was there with the complaining witness,

25   correct?

1    A    Right, he's the person that came back and found the door

2    locked and then later saw Ruiz and the witness there.

3    Q    Okay.  And whenever the complaining witness came out of

4    the room -- I know I already asked you this, but just to put it

5    into context -- he didn't say that he saw her crying, right?

6    A    That's right.

7    Q    In fact, he made (audio glitch) later on, right?

8    A    According to some testimony, yes.  Yes.

9    Q    The complaining witness on this alleged incident said that

10   she recognized Mr. Ruiz, correct?

11   A    Right.

12   Q    And she recognized him from when he would come to the

13   restaurant where she worked, correct?

14   A    Yes.

15   Q    And, you know, she told you guys that, or other law

16   enforcement agencies, that she always felt that Ruiz kind of

17   stayed to himself, right?

18   A    Yes, I think so.

19   Q    That he was just a quiet guy.

20   A    Right.

21   Q    After this alleged incident this complaining witness had

22   several text message exchanges with a friend of hers that also

23   knew who Mr. Ruiz was, correct?

24   A    I am not familiar with those.

25   Q    And this happened on August 11, 2019, and she did not

1   report this alleged incident until was it late November or

2   early December?

3   A    That time frame, yes.

4   Q    Are you aware if this person has applied for any sort of

5   U-visa or anything like that?

6   A    I'm not aware of any application.

7   Q    Oh, by the way before I forget.  When you interviewed the

8   first complaining witness she had a lawyer present during that

9   interview, correct?

10  A    Yes.

11            THE COURT:  Let me ask this, Mr. Martinez.  On the

12  second victim, the second alleged victim when you said that she

13  applied for a U-visa.  Does she have legal status in the United

14  States?

15            MR. MARTINEZ:  I don't believe so, based on

16  everything that I've read.

17            THE COURT:  I mean is that why you were asking that

18  question --

19            MR. MARTINEZ:  Yes.

20            THE COURT:  -- like did she -- get status because she

21  was the victim of abuse?

22            MR. MARTINEZ:  Well, it's a lot more than that

23  because once they do that, they fill out this whole application

24  with a whole narrative of facts and factual statement as to why

25  (audio glitch) so that's what I was getting at.

1           THE COURT:  Right.  Right, so you were getting at

2      that if she'd done that that -- I mean two things that may

3      substantiate her claim, then it would also be if what she's

4      saying is corroborated, what she told other people?

5           MR. MARTINEZ:  Correct.

6           THE COURT:  Okay.  Understood.

7         (Audio glitch)

8           THE COURT:  Agent Whitmire, how old was -- how old is

9      the son of alleged Victim No. 2?

10          THE WITNESS:  I believe at the time of the incident

11     he was approximately eight-years old.

12          THE COURT:  Okay.  Thank you.

13          Go ahead, Mr. Martinez.

14     BY MR. MARTINEZ:

15     Q    This restaurant that she worked at, Mr. Ruiz, as far as

16     you know, never went back there and tried to talk to some of

17     her co-workers or anything like that after this alleged

18     incident?

19     A    As far as I know, no.

20          MR. MARTINEZ:  I'll pass the witness.

21          THE COURT:  So, Agent Whitmire, so Mr. Cano, he saw

22     -- tell me again what he saw, what his purpose of knocking on

23     the bedroom door was?  Why did he come back to the house?  What

24     was sum and substance of that?

25          THE WITNESS:  Well, yes, sir, Your Honor.  After this

1   -- the arrest of the boyfriend the family sort of descended on

2   the boyfriend's house and tried to figure out what to do.

3   There was a lot of chaotic activity while they figured out what

4   to do about their father or their friend or whoever he was to

5   them.

6            And Mr. Cano was the boyfriend of the victim's

7   daughter.  And so, he was sort of involved in this family chaos

8   and he showed up at the house to just join -- how he could help

9   the boyfriend out, I think.

10           THE COURT:  And so who's at the house when he shows

11  up?

12           THE WITNESS:  Mr. Ruiz, the victim and the eight-year

13  old boy.

14           THE COURT:  And so did the eight-year old boy let him

15  in the house?

16           THE WITNESS:  No, sir.  As I understand it the front

17  door was unlocked.  Mr. Cano went into the living room, found

18  the eight-year old boy by himself, and that motivated Mr. Cano

19  to try to find the boy's mother in the house.  And that's why

20  he was trying doorknobs.

21           THE COURT:  And what was his reaction when he knocked

22  on the door, the bedroom door and the alleged Victim No. 2 had

23  a police officer in the bedroom?

24           THE WITNESS:  Well, he initially knocked then he went

25  away for eight to ten minutes, he said.  Then he came back and

the door had been opened. And he told me that he was not
concerned with the scene he encountered. He was rather -- he
just told the victim, Come take care of your son, can you come
take care of your son. He was worried the boy was going to
wander out of the house. And so he told me that was his -- the
substance of his communication with the victim and Mr. Ruiz,
was someone needs to take care of this young boy.

THE COURT: Okay. And did you ask him if he found --
like why he thought someone in a police uniform would be in the
bedroom?

THE WITNESS: He said he was completely mentally --
his girlfriend was threatening to leave the house, so he was
trying to keep her from leaving, he was trying to find the
boy's mother. And he said he didn't have time to think of
really much else.

THE COURT: Okay. And what was -- I didn't know
until now Victim No. 2's -- do you know what her status is? Is
she unlawfully present in the United States?

THE WITNESS: At the time of the incident, yes, sir,
I believe she was.

THE COURT: Okay. And what did she -- what was her
reason for not reporting it contemporaneously?

THE WITNESS: She told us several reasons, sir. She
felt that he was a police officer and no one would believe her.
She said he had also threatened her that he had many contacts

1    in the area and he could make something happen to her if she

2    made a report.

3              THE COURT:  And from the -- is there any -- I know

4    there's a dispute about what happened, Mr. Martinez, but

5    there's no dispute from the police records that Officer Ruiz

6    was at that house.  The dispute is what happened in the house?

7              MR. MARTINEZ:  Well, there's a dispute about the time

8    frame of when he was there.  And, you know, there is about

9    1,000 pages worth of discovery that I received a week-and-a-

10   half ago, roughly, so I'm working my way through all of it.

11   But as far as there might -- there is a dispute about the time

12   frame of when these supposed allegations happened.  But there

13   is police records that show Mr. Ruiz at that house at some

14   point in time.  And I think that's based on maybe MDTs and dash

15   cam video.

16             THE COURT:  Okay.

17             MR. MARTINEZ:  So opportunity is something that, you

18   know...

19             THE COURT:  Okay.

20             Go ahead, Mr. Edwards.

21             MR. EDWARDS:  Thank you, Your Honor.

22             REDIRECT EXAMINATION OF MICHAEL WHITMIRE

23   BY MR. EDWARDS:

24   Q    Agent Whitmire, just a few followup questions.  So during

25   the last hearing that Mr. Martinez asked you questions about

1    Officer Ruiz and the interview he did with Texas Rangers,

2    during that interview, number one, have you had an opportunity

3    to review that full interview?

4    A    Yes.

5    Q    And is it correct that the Rangers explained to Officer

6    Ruiz that it was a voluntary interview?

7    A    Yes.

8    Q    And did they also tell him that he was free to terminate

9    the interview at any time?

10   A    They did.

11   Q    And that he was free to leave at any time?

12   A    Yes.

13   Q    And is that something that they reiterated throughout the

14   interview?

15   A    Yes.

16   Q    All right.  And did it appear that Officer Ruiz or former

17   Officer Ruiz understood that it was a voluntary interview and

18   that he was free to go?

19   A    It appears so to me.

20   Q    And during the course of that interview isn't it correct

21   that they actually went outside and conducted a part of the

22   interview?

23   A    Yes.

24   Q    And why did they go outside?

25   A    Mr. Ruiz requested it.

1   Q    Do you know why he requested it?

2   A    I believe he mentioned in the interview that there was

3   cameras recording the interview, and so he wanted to go outside

4   to talk further to them.

5   Q    Okay.

6            THE COURT:  Did that interview occur on November

7   16th?  When did that interview occur?

8            MR. MARTINEZ:  I believe it was the 20th.

9            THE COURT:  20th?  Okay.

10  BY MR. EDWARDS:

11  Q    And now regarding Victim 1, Agent Whitmire.  She did

12  indicate that she had been smoking marijuana earlier that day.

13  You know, the afternoon on the 15th; is that correct?

14  A    Yes.

15  Q    And is it correct that she also said that she believed

16  that Officer Ruiz could have or would have smelled the

17  marijuana, could smell the marijuana from her vehicle?

18  A    She believed that, yes.

19  Q    But she also indicated that it wasn't a regular stop; is

20  that correct?

21  A    That's what she said, right.

22  Q    And she also said that she had been drinking earlier that

23  day, right?  Or that night, correct?

24  A    Yes.

25  Q    And that she was, I think, "tipsy" was the word she used

1    to describe it?

2    A    I think so, yes.

3    Q    And she was afraid that she might be arrested for DWI; is

4    that correct?

5    A    Yes.

6    Q    But Officer Ruiz didn't do a field sobriety test; is that

7    right?

8    A    No.

9    Q    And he didn't take her up on the offer to search her

10   vehicle; is that correct?

11   A    That's correct.

12   Q    And he didn't ask for her license or registration; is that

13   right?

14   A    He asked for her license, but not her registration.

15   Q    Okay.  And Mr. Martinez alluded to the fact that there was

16   -- that she had been drinking Patron with her friend at the

17   Seaside Lounge, at least they had some outside of the lounge to

18   drink Patron; is that correct?

19   A    That's what the victim said, yes.

20   Q    And so there was a bottle of Patron still remaining in the

21   vehicle; is that correct?

22   A    Yes.

23   Q    And you testified previously about how Officer Ruiz had

24   her take several shots of that Patron right before the sexual

25   assault occurred; is that correct?

1    A    That's what she said, yes.

2    Q    All right.  But he himself did not -- according to her he

3    did not take any or drink any of the Patron; is that right?

4    A    That's right.

5    Q    Now when Officer Ruiz attempted to stop Victim 1, you just

6    testified or Mr. Martinez alluded to the fact that it took him

7    four minutes to pull her over; is that right?

8    A    Yes.

9    Q    All right.  And what was she doing in the vehicle or what

10   did she indicate she was doing as he was behind her with his

11   lights flashing?

12   A    She called her friend on the telephone.

13   Q    And did she remain on the phone with her friend until he

14   pulled her over?

15   A    Yes.

16   Q    And is this the same friend, you testified previously,

17   that she was text messaging?

18   A    Yes.

19   Q    And that would be the text message where she indicated

20   that she -- something to the effect of "I'm going to die"?

21   A    That was the same friend, yes.

22   Q    Now after Officer Ruiz stops her for the first time is it

23   correct that he gets her driver's license and then tells her to

24   follow him; is that right?

25   A    Yes, that's what she said.

1   Q    All right.  And you just testified on the question by Mr.

2   Martinez that -- could you describe again how they pull off?

3   Who pulls off first?

4   A    Mr. Ruiz pulled off first.

5   Q    And so what occurred that caused him to pull her over for

6   a second time?

7   A    Mr. Ruiz tried to make a left-hand turn and he saw

8   Victim 1's car go past him on his right side and continue

9   straight.  And then he pulled his car back, straightened up

10  behind her again and pulled her over.

11  Q    And so the dash cam shows him pulling her over for a

12  second time; is that right?

13  A    Yes.

14  Q    And what does she say was his demeanor when he pulled her

15  over for a second time?

16  A    She said he was irritated.

17  Q    And did she say why he was irritated?

18  A    Because she had not followed him.

19  Q    And he had her ID at this point; is that correct?

20  A    Yes.

21  Q    And he admitted during questioning with Texas Rangers that

22  he in fact took her ID from her and told her to follow him;

23  isn't that right?

24  A    Yes.

25  Q    Now did you talk to her about why she didn't call 911?

1    A    Yes, we asked her that.

2    Q    And what did she respond?

3    A    She said she was afraid the call would be routed to him or

4    he would hear the call over the radio or somehow learn about

5    it.

6    Q    So, essentially, she didn't call 911 because she viewed

7    him as 911; is that right?

8    A    That's right.

9    Q    Now after the incident in the vehicle, the sexual assault

10   in the vehicle, she drove off; is that correct?

11   A    Yes.

12   Q    And you previously testified that she pulled off and

13   stopped.  How far off did she pull away?

14   A    To me it looks like maybe 100 yards.

15   Q    And can you describe kind of where she was located as she

16   stopped in her vehicle?

17   A    Yes.  She stopped at the first cross street that she came

18   to after leaving the cul-de-sac.

19   Q    And how long was she stopped in that position until

20   Officer Ruiz pulls up behind her?

21   A    I'd probably say a little less than a minute.

22   Q    All right.  And do you recall if he activated his lights

23   and sirens when he pulled --

24   A    No.

25   Q    When he stopped behind her.

1    A    I did not see any lights activated, no, or hear a siren.

2    Q    But it is visible on the dash cam?  That's something

3    that's visible on the dash cam; is that correct?

4    A    The stop is visible, yes.

5    Q    And again she indicated that she got out of her car after

6    he pulled up behind her in order to retrieve her license from

7    him?

8    A    Yes.

9    Q    Now you previously testified that she went home briefly,

10   but then she went to the home of someone she met on Instagram;

11   is that right?

12   A    That's correct.

13   Q    All right.  Now was this a gentleman that she had just met

14   on Instagram or she previously knew him through meeting him on

15   Instagram?

16   A    She previously knew him.  She had met him a couple of

17   times before, I think.

18   Q    And is it correct that she went to his house and they sat

19   in the car?

20   A    Yes.

21   Q    And did she indicate whether she went inside of his house?

22   A    I don't believe she went inside his house.

23   Q    And do you recall asking her why she went to that

24   gentleman's home?

25   A    She said she just didn't want to be alone and wanted to

1   talk to somebody after what had happened to her that night.

2   Q    And did she talk to him about what happened to her that

3   night?

4   A    Yes.

5   Q    And did you have an opportunity to speak with this

6   gentleman?

7   A    Yes, I did.

8   Q    And what did he indicate that she told him about what

9   happened that night?

10  A    His exact words were -- he was not very happy to talk to

11  me, but his exact words were "she told me a cop pulled her

12  over, he made her suck his dick and he let her go."

13  Q    Now regarding Victim No. 2.  You talked about interviewing

14  Mr. Cano, Mr. Estaban Cano, the boyfriend of Victim 2's

15  daughter; is that right?

16  A    That's right.

17  Q    And did you also interview Victim 2's daughter?  Or have

18  an opportunity to review Texas Ranger or local PD, Manvel

19  Police interviews of her?

20  A    Yes.

21  Q    And do you recall what she said regarding her mother's

22  demeanor after the night of this sexual assault?

23  A    The daughter said the mother had changed, was not the

24  happy person that she was before this night.

25  Q    Now you've had an opportunity to interview Victim 2; is

1    that correct?

2    A    Yes.

3    Q    Can you describe what her demeanor was during the

4    interview as she told about the events that unfolded on the day

5    of the sexual assault?

6             MR. MARTINEZ:  I'm going to object to relevance as to

7    --

8             THE COURT:  Overruled.  Go ahead.

9    BY MR. EDWARDS:

10   A    Victim 2 said -- well, she was crying through most of our

11   interview.  At times crying very hard, couldn't get her breath.

12   She had to take two breaks during the interview with a victim

13   specialist and go out in the lobby and compose herself twice

14   before she came back in and continued the interview.

15   Q    Okay.

16            MR. EDWARDS:  I don't have any more questions.  I

17   pass the witness, Your Honor.

18            THE COURT:  Any recross, Mr. Martinez?

19            MR. MARTINEZ:  Yes, Your Honor.  Thank you.

20            RECROSS-EXAMINATION OF MICHAEL WHITMIRE

21   BY MR. MARTINEZ:

22   Q    You mentioned that the Complaining Witness No. 1 mentioned

23   that Mr. Ruiz was irritated --

24   A    Yes.

25   Q    -- right?  Complaining Witness No. 1 was on the phone with

1    her friend during at least one of the times that Mr. Ruiz

2    approached her vehicle, right?

3    A    I think so, yes.

4    Q    And her friend did not say that she heard Mr. Ruiz yell at

5    her, right?

6    A    That's correct.  Correct.

7    Q    Now you also said that the complaining witness told you

8    that she went to this guy's house who she met on Instagram

9    because she didn't want to be alone.

10   A    Right.

11   Q    Well, her mom was home, right?

12   A    I'm sorry, the video broke up again.

13   Q    When she got home and then left, her mother was home.  Her

14   mother was home.

15   A    Yes.

16   Q    And her dad was home.

17   A    Her mother was at the mother's house, I believe, yes.

18        MR. MARTINEZ:  I don't have any further questions.

19        THE COURT:  Okay.  Anything else, Mr. Edwards?

20        MR. EDWARDS:  No, Your Honor.

21        THE COURT:  Okay.  Do you have any other witnesses or

22   we'll turn to Mr. Martinez's witnesses?

23        MR. EDWARDS:  Your Honor, we can turn to Mr.

24   Martinez's witnesses.

25        THE COURT:  You can call them, Mr. Martinez, you can

1    proffer them, however you want to proceed, you go ahead.

2           MR. MARTINEZ:  Okay.  I have on video, I think it's

3    under the name "witness," I have Amy Ruiz.  So I'm going to

4    call Amy Ruiz to testify.

5           THE COURT:  Okay.  Go ahead, Sharon, can you swear

6    her in?

7           THE CLERK:  I'm hearing -- is anybody hearing like

8    some music because I can barely hear.  Is it just me?  I'm

9    hearing music.

10          THE COURT:  I think it's just you.

11          THE CLERK:  Okay.  Can you raise your right hand,

12   please?

13      (Witness sworn.)

14          MR. MARTINEZ:  And move forward, Your Honor?

15          THE COURT:  Go ahead.

16               DIRECT EXAMINATION OF AMY RUIZ

17   BY MR. MARTINEZ:

18   Q    Please state your name for the Record.

19   A    Amy Ruiz.

20   Q    Ms. Ruiz, how do you know Hector Ruiz?

21   A    He's my brother.

22   Q    And where do you live?

23   A    We live at my mom's house in Rosharon.

24   Q    And who lives there at that house?

25   A    My parents and my other three siblings.  Younger siblings.

1    Q    And does Hector live at that house too?

2    A    Yes, with his wife and two kids.

3    Q    And what do you do for a living?

4    A    I'm a nurse assistant.  I work for (indiscernible).

5    Q    And how long have you had that job?

6    A    About two years.

7    Q    So is Hector still married?

8    A    Yes.

9    Q    And his wife, how long has he been married with his wife?

10   A    About five years.

11   Q    And they still live in the same house?

12   A    Yes.

13   Q    Were you living at that house when Hector was arrested?

14   A    Yes.

15   Q    And have you been living at that house since he was

16   released on bond for the State case?

17   A    Yes.

18   Q    What kind of conditions -- Or let me ask you this.  He had

19   some conditions where he couldn't leave at a certain time,

20   right?

21   A    Yes.

22   Q    Can you tell the Judge how he -- what he did, what has he

23   been doing since he was released on bond in Fort Bend County?

24   A    Well, since the beginning he would just stay home, like

25   taking care of the kids.  Later on he would go to a temple.

Well, he actually asked permission to the probation officer if they could extend his time so he would attend to a temple.  But most of the time he would just stay home with the kids.

Q    And what kind of things.  Was he kind of helping them during this pandemic with their school work and things like that?

A    Well, he has two kids, a two-year-old and a four-year-old. They don't go to school yet, but he will be at home taking care of them, make sure they have clean clothes, feed them, and he would do some school activities with them.

Q    You mentioned that he was going to a temple.  Can you tell the Court what he was doing at the temple and what kind of temple it is?

A    It's a Buddhist temple.  And he was going there, help out people to have a seat, pass around food or (indiscernible).

Q    And how long has he been doing that?

A    For about -- um, since he got out maybe like eight or nine months.

Q    How often was he going to that temple?

A    He would go every Monday and later on he went Tuesdays.

Q    There's a lot of people on the call and so, is it fair to say that your brother has a lot of support in his immediate family, but also his wife's family?

A    Yes.

Q    And are some of these people present on the call right

1   now?

2   A    Yes.  Right now we have my sister-in-law, my cousin, my

3   dad, well, my step-dad, our neighbor.  The -- family which is

4   uncle, brother and cousin and aunt.

5   Q    When he was on bond was he working?

6   A    No, he started to work later on like the last month that

7   he was out.

8   Q    And was part of the reason why he wasn't finding

9   employment because he didn't really want to leave the house?

10  A    Exactly.  He was afraid that he -- he knew if he came out

11  in public he didn't want to put his face out there because he

12  has two kids and he didn't want anything to happen to him or to

13  his kids or wife.  So he would just stay home.

14  Q    Would he also help -- What does your mom do for a living?

15  A    We have a food truck and she works there.

16  Q    And would your brother help her, you know, kind of prepare

17  the meals for her job?

18  A    Yes.

19  Q    If the Judge were to release him on bond, where would

20  Hector go and live?

21  A    He will stay with us.  My parents' house.

22  Q    Do you believe that if the Court releases him on bond do

23  you believe that he will comply with the conditions of bond?

24  A    Yes.  He did in the beginning, he always will.

25          MR. MARTINEZ:  I'll pass the witness.

1          THE COURT:  Mr. Edwards.  You're on mute.

2          MR. EDWARDS:  Thank you, Your Honor.  I'm sorry about

3     that.

4                    CROSS-EXAMINATION OF AMY RUIZ

5     BY MR. EDWARDS:

6     Q    Ms. Ruiz, have you had an opportunity to talk to your

7     brother about these charges?

8     A    Yes.

9     Q    And could you explain what he has said about these

10    charges, the veracity of these charges?  What is the

11    explanation he has given you for what occurred on those two

12    nights?

13    A    Not much detail since I don't -- I don't -- I don't ask.

14    But I kind of know what's going on.  And pretty much what he

15    has said was that he wants this to be clear.  I know that he

16    didn't do anything wrong.

17    Q    And has he said whether or not the charges are true?

18    A    Not true.

19    Q    Has he said whether or not he came in contact with these

20    women, Victim 1 and Victim 2?

21    A    I'm sorry, what was the question?

22    Q    Has he indicated whether or not he actually came in

23    contact with Victim 1?

24    A    On the accident that happened or...

25    Q    No, no.  And so, Mr. Ruiz is charged with violating the

1    civil rights of Victim 1 basically by committing, you know,

2    sexual assault on her.  Now has he discussed this with you and

3    indicated that, yes, he had consensual sex with her and that it

4    wasn't a rape or sexual assault?  Or has he said that, you

5    know, he doesn't know her, never met her and that it's a

6    complete fabrication?

7    A    Well, he said that, yes, he had sex with her, but it was

8    nothing forced.

9    Q    Okay.  And how about as to the second woman, who we allege

10   is Victim 2 in the indictment?  Again, has he said that, yes, I

11   had sex with another woman that was completely consensual, or

12   that it's a complete fabrication, I never had sex with her?

13   A    No, he never touched her.

14   Q    So as to Victim 2 he says he never touched?

15   A    Yes.

16   Q    Does he admit to being at her -- you know, going to her

17   house at some point after her boyfriend was arrested for DUI?

18   A    I know that he gave her a ride with her son to a house.

19   I'm not sure which one.  But he just said I dropped them off

20   and nothing else happened.

21   Q    Okay.  Now from the perspective of a woman could you

22   understand a woman who alleges she's been raped or a victim of

23   sexual assault feeling afraid if the individual who assaulted

24   her is still free and on the street?

25        MR. MARTINEZ:  I'm going to object to her speculating

1  about what another person is feeling.

2          THE COURT:  I'll sustain that, Mr. Edwards.

3  BY MR. EDWARDS:

4  Q    Ma'am, were you surprised about these allegations against

5  your brother?

6  A    Yes, it's my brother.  I know he's a good person.

7  Q    And would you describe him as a very quiet individual?

8  A    Yes.  With other people, yes.

9  Q    And would you also say that you believe him to be a good

10 police officer?

11 A    Yes.

12 Q    Now he works the bank shift; is that correct?

13 A    Yes.

14 Q    All right.  And so, were you ever with him on any of his

15 shifts, just as a ride along or to observe what he did, you

16 know, what he did during the shifts?

17 A    No.

18 Q    And now this is your brother and you don't want to see him

19 go to jail for this offense; is that correct?

20 A    Correct.

21 Q    And as his sister you would do whatever it -- whatever was

22 needed to assist your brother; is that right?

23 A    Yes.

24 Q    All right.  Because as a family, families stick together;

25 is that correct?

1    A    Correct.

2         MR. EDWARDS:  Thank you, Your Honor.  I appreciate

3    it.  I don't have any other questions, Your Honor.

4         THE COURT:  Anything else, Mr. Martinez?

5         MR. MARTINEZ:  No, Your Honor.

6         THE COURT:  Any other witnesses, Mr. Martinez?

7         MR. MARTINEZ:  I will call one more witness to

8    testify and I will proffer the rest.  Is that --

9         THE COURT:  Okay.

10        MR. MARTINEZ:  Liz Flores.

11        THE COURT:  Good afternoon.

12        Shannon, can you swear her in.

13   (Witness sworn.)

14             DIRECT EXAMINATION OF ELIZABETH FLORES

15   BY MR. MARTINEZ:

16   Q    Good afternoon, Ms. Flores.  Can you please state your

17   full name for the Record?

18   A    Elizabeth Flores.

19   Q    And what do you do for a living?

20   A    I'm a social worker.  I've been a social worker for 10

21   years.

22   Q    And where are you employed right now?

23   A    Now I work for Lone Star Social Services.  It's an

24   adoption agency.  So (audio glitch).

25   Q    And how do you know Hector Ruiz?

1    A    At the temple.  I assist the volunteer coordinator with

2    the volunteers, so I know him from there.

3    Q    And what kind of sort of help would Mr. Ruiz do at the

4    temple?

5    A    He's done a little bit of everything.  But mostly ushering

6    the guests that come in, welcoming people, serving food,

7    passing out, you know, gifts and pretty much also -- also at

8    the parking lot escorting people to their cars and starting

9    them out.

10   Q    When would he go and volunteer here at this temple?

11   A    Monday nights mostly.  Like weekends.  Like there has been

12   some other weekdays.

13   Q    And Monday is your busy day, basically, because that's why

14   he would go and volunteer on that day?

15   A    Yes.  Mondays we have about -- we'll get about 2,000

16   people that come in, probably more.

17   Q    Did you ever have any disciplinary problems with him when

18   he would go and volunteer?

19   A    No, not at all.

20   Q    Did you ever feel unsafe around him?

21   A    No.  He's always very polite, very kind, respectful,

22   honest, diligent.  A good, nice guy.

23   Q    Would he show up on time when it was time to volunteer?

24   A    Yes.  Very reliable.

25   Q    Did you ever -- did you ever hear of any problems from the

1    people that were going to the temple with -- that had any

2    problems with Mr. Ruiz?

3    A    No complaints.  No issues.

4    Q    And how long -- do you know how long he was volunteering

5    at the temple?

6    A    Roughly, from what I can remember, about seven months.

7    Maybe a little bit more.

8              MR. MARTINEZ:  I'll pass the witness.

9              THE COURT:  Thank you.

10             Mr. Edwards.

11             MR. EDWARDS:  Yes, Your Honor.

12                CROSS-EXAMINATION OF ELIZABETH FLORES

13   BY MR. EDWARDS:

14   Q    Ma'am, you indicated that Mr. Ruiz started ushering at the

15   temple approximately seven months ago?

16   A    Yes.

17   Q    So it would have been after he was charged by the State

18   with these charges that he's facing; is that correct?

19   A    Yes.

20   Q    And you indicated that there are approximately 2,000

21   people that attend the temple.

22   A    Yeah, probably more than that.

23   Q    And what percentage of those would you say are women?  Is

24   it 50 percent or more?

25   A    It's more than 50 percent, yes.  It's mostly women --

1    yeah.

2    Q    Okay.  Thank you, ma'am.

3              MR. EDWARDS:  I've no further questions, Your Honor.

4              THE COURT:  Okay.  Mr. Martinez, what would you like

5    to proffer?  You're on mute.

6              MR. MARTINEZ:  Luis Garza is in my office, Your

7    Honor.  I can have him come to the screen where I can just

8    proffer him.

9              THE COURT:  Sure.  I don't need to see him.  You can

10   just proffer what he would say.

11             MR. MARTINEZ:  Okay.  So, Mr. Garza has known Mr.

12   Ruiz since high school.  They played on the same soccer team.

13   And now Mr. Garza is married to Mr. Ruiz's cousin.  They have

14   gathered -- they have known each other for a very long time and

15   now he is considered family.  And he has always known Mr. Ruiz

16   to be calm and even-keeled since he was in high school.

17             He knows that Mr. Ruiz has tried to take care of his

18   family since he was released on bail, spending time with his

19   kids, volunteering at the temple, helping his mother around the

20   house and also with her food truck business.  He does not

21   believe that Mr. Ruiz is a danger to the community or a flight

22   risk.

23             Also at my office is his mother Myrna Saragoza

24   (phonetic).  She has supported him, obviously, since he was

25   first arrested by Fort Bend County.  She would go to court with

him when his case was pending in Fort Bend County.  She
mentioned that while he has been out on bond for the large
majority of his time Mr. Ruiz would spend time at home.  And
when he was at home he was actually helping Amy Ruiz build a
house within their same complex.  She is a hard worker.  She
describes her family to be very close and she does not believe
that her son will flee or that he's a danger to the community.

That's the three proffers that I have.  Obviously
(audio glitch) that are here to support him and will continue
to support him throughout the pendency of this case.

Before I forget, Your Honor, I'd like to offer the
exhibits that I had emailed to you last week.  They are
certified court documents from Mr. Ruiz's case in Fort Bend
County, and I'll offer them at this time.

THE COURT:  Okay.  Just describe them and -- just
describe them *en masse* and then I'll ask Mr. Edwards if he has
any objection.  Describe them for the Record.

MR. MARTINEZ:  Exhibit #1 is a copy of his bond
conditions.  Exhibit #2, Exhibit #3, Exhibit #4, Exhibit #5,
Exhibit #6 are signed resets of when Mr. Ruiz was appearing in
court.  Exhibit #7 is the bonding paperwork where it shows that
he bonded out on December 2nd of 2019.  I did provide a copy
for the Government prior to the hearing today.  Like I said,
they're certified copies, so I'll offer them at this time.

THE COURT:  Any objection, Mr. Edwards?

1          MR. EDWARDS:  No, Your Honor.  No objection.

2          THE COURT:  They'll be admitted.

3          You're muted, Mr. Martinez.

4          MR. MARTINEZ:  Sorry.  I don't have any further

5 witnesses.

6          THE COURT:  Okay.  So, you know, I'll give you my

7 thoughts.  I haven't made up my final mind, but and then I'm

8 happy to hear your argument.  I mean I've heard argument from

9 both of you as we've gone on from last week.

10          With the facts you have, Mr. Martinez, you've done a

11 great job, so any decision I make I don't want a reflection on

12 you.  I think that your client, Mr. Ruiz, is in good hands.

13          But what I'm struggling with is I understand that you

14 have a situation where he was initially charged by the State.

15 He was initially charged by the State and then he's been on

16 bond for that conduct for the last year.  And so your argument

17 is logical that there are conditions because he's followed

18 these conditions.  But what I'm struggling with is this is a

19 different case in the sense it's a federal case that you have a

20 police officer that's charged with rape, that if he gets

21 convicted it's two counts.  The grand jury, you know, is true-

22 billed and so I have to accept at least the grand jury finding

23 that there's probable cause that these two acts occurred.  And

24 then we've heard evidence, obviously, hearsay is allowed.  I'm

25 not seeing the two victims, but I'm not Judge Eskridge

(indiscernible) and we're far from a conviction.

But what I'm struggling with, Mr. Martinez, is if he is convicted I mean there's a highly likely chance that he's either going to get life or a very close sentence to life.  In the federal system there's no parole.  And so, trust me, I've thought about this case every day since we've had it.  And probably the toughest thing that I deal with as a magistrate judge is deciding (indiscernible).

But you can't get any more serious of a federal case than this.  I mean you have federal cases, drugs cases that the quantities get someone life, but there's no violence in this case.  We have financial crimes where the loss amount gets people for life.  But I mean here we're talking about a police officer that's charged with sexual assault on two different victims and at least one of them, it appears from the evidence before me, that there's no dispute that he pulled her over, he didn't know her, she was under the influence and it seems that his version will be that she consented and her version that it's rape.  But that still -- it's a tough problem because it's -- I mean you just don't ever think of a police officer and that goes against all training, that he would pull somebody over that's under the influence, that he'd even think about that (indiscernible) to an act.

And so, I really just have to weigh is that you have somebody that would be out on bond, but if they're convicted

there's a high probability for a life sentence or close to life. And that's what I'm struggling with when weighing the factors of potential flight risk or safety of the community. I mean you've done -- you know, in the short amount of time you've had for discovery you've made all the right arguments, Mr. Martinez. And I started -- when we started this I thought, you know, in my mind like this was a no-brainer. And you really forced in the last week, you really honed in on the arguments that you made and the evidence that you presented. And so, I need more time, but I'm leaning toward detention. And it's not an easy call it's just the reason of -- the nature of the crime and if he is -- if he is convicted, what the sentence would be. And so that's my thoughts.

But I'm happy to hear from you, Mr. Martinez. Like I said, I mean this is probably a likely trial and your client is lucky -- you've done an excellent job of putting these arguments and I'm sure you'll do an excellent job at trial. But that's my thoughts now.

MR. MARTINEZ: Judge, and I appreciate all of the comments. I know that you've thought about this case a lot and I can't ask for anything more than a thoughtful consideration, even in light of this very serious matter.

I've also thought about this case a lot since I was retained about a week-and-a-half ago. And one of things that I thought about over the weekend was the Government's argument

that it's their position that Mr. Ruiz is a flight risk.  And I

think that --

(Audio glitch)

THE COURT:  I can take that.  Mr. Edwards, you know,

I'm weighing that, regardless -- Mr. Edwards' position is that

he's a danger to the community.  He's not arguing flight risk.

But I'm considering that, based on all the evidence I've heard,

that -- and I can do that in my role.  But that would be me.

He hasn't said that.

MR. MARTINEZ:  I'm sorry, did you say he hasn't said

that or --

THE COURT:  That Mr. Edwards was saying the

Government is pursuing on a danger to the community (audio

glitch) flight risk.  But on my own I'm considering, based on

the sentence, I'm considering -- just because the Government

doesn't believe doesn't mean that I can't on my own have those

findings.  But go ahead.

MR. MARTINEZ:  Of course.  And, you know, what I have

gone back to since the beginning is when he first gets

interviewed by the Rangers and gets confronted with these

accusations.  And, you know, he had time to, you know, leave

town, skip town.  You know, he is a police officer and if he

were to spend any amount of time in jail his life is at risk.

And although that I seriously doubt that the Bureau of Prisons

would have cooperated in coming in here and said what kind of

1  conditions of confinement Mr. Ruiz would be under BOP because

2  of his status as a former police officer, I suspect that they

3  would say that they would keep a very close eye on him.

4  But, you know, he gets confronted by the Rangers and

5  they come to his house and they find him right in the place

6  where they expected to find him.  He gets out on bond, no new

7  crimes, no bond violations, no tampering with witnesses.  Now

8  we're not only talking about civilian witnesses, but we're

9  talking about law enforcement witnesses, as well.  His co-

10  workers, the Fort Bend County Sheriff's Office.  You know, it

11  would have been very simple to just go and talk to a fellow

12  officer and say, Hey, put in a good word with me.  Or talk to

13  his sergeant, talk to the Fort Bend County.

14  And I don't think that there's any evidence on (audio

15  glitch) Ruiz attempted to tamper with any evidence after he

16  became aware that he was being investigated by the Texas

17  Rangers.  Which, you know, they're an intimidating group.  I've

18  seen them come to my office and spend time with lawyers.  I

19  mean and he could have, I guess, you know, done things to cover

20  his tracks, but he didn't.  There's no evidence of that.

21  He stayed home with his family for most of the time.

22  He had that support.  He still has that support.  His wife, his

23  wife's family.  I don't think there is a risk of flight here.

24  I think that, you know, this is a person that's been out on

25  bond for almost a year.  And he has, I guess, accumulated

almost a year's worth of credit.  And we're not talking about, oh, well, he might fly, he might not.  Well, here's a year's worth of credit where he has done the right thing.  He's told -- he's been told what to do and he does this.  You know, if a year's worth of being compliant and not just showing up to court, but having this GPS monitor and showing up every month, if a year's worth of doing the right thing is not sufficient to rebut the presumption and not sufficient to set him on conditions of release, then this might as well be a mandatory detention case.  Because I can't think of another scenario where a person is just on bond for a year doing the right thing and he gets detained.  And I know that the Court is -- has to weigh the strength of the evidence.

One of the things that I've thought about about this case is reminded of what Justice Scalia said in the famous *Crawford versus Washington* decision.  And he said that nothing is more essential than the cross-examining of witnesses before the triers of fact.  I can't do that here.  I can't do that in a detention hearing.  I can't confront Complaining Witness No. 1; I can't confront Complaining Witness No. 2.  Unlike a drug case where you have an agent testify or probably what the evidence is going to be.  So when you have actual people that have to be confronted, it's a whole different ball game.  And it comes -- and I know that you have heard evidence, but this case is probably going to be decided from the credibility of

the people that testify. And I cannot do that at this point. And it pains me to cross-examine an FBI agent about his recollection of testimony and double or triple layers of hearsay. It's just -- I can't do it. Nobody can.

So I just want the Court to take that into consideration. I'm not going to, you know, go over all of his conditions of release, but he's done all that. He's gone to a temple. He's had no complaints there. And he's tried to do the right thing.

And the other thing to consider is if you were to release him, well, he's not only going to be under supervision of Federal Court, but he's also going to be supervisioned in State court. So that's two visits, that's probably two drug tests, that's two court dates that he has to appear in and has to report. So now you're going to have a person that's on two bond supervisions, which I think is significant. Obviously, you see these cases -- you see cases where they're on supervision in a State court. I don't -- I think it's unprecedented where they're on supervisions in two different jurisdictions. And I think that's something that also rebuts the presumption and, you know, can persuade the Court to set conditions of release.

THE COURT: Mr. Edwards?

MR. EDWARDS: Yes, Your Honor. Your Honor, as to the, you know, the basis for confinement, we have argued all

along that he is a danger to the community.  We haven't argued

flight risk because we feel that the evidence that we can see,

touch and feel goes to, you know, his actions of being a

danger, in particular to women.  But, Your Honor, you are

correct in considering all the factors and the fact that, you

know, he is facing a life sentence and the severity of the

charges is definitely something to weigh heavily when

considering whether or not to confine Mr. Ruiz until trial.

But, Your Honor, you know, speaking to argument of

him being a danger, this is a former officer who swore to

protect and defend.  And so, unlike, you know, your normal

rapist, if we can even call it that, you know, the state of

mind of someone who carries a weapon who's in a position of

authority over women, you know, to commit this type of act,

Your Honor, the way he committed this type of act, well, we've

really tried to enforce on the Court.

Really, the fact that it's something that's a

surprise to his family.  Everyone sees him as a quiet -- as a

quiet guy.  But under the cover of darkness at night he's

committing these acts with vulnerable women who he has in these

vulnerable positions and he has -- he used that authority to

exploit that by putting Victim 2 in fear that, you know, he has

friends in high places who can do things to her and that she

could be deported or that her son could be taken away.  By

putting Victim 1 in fear that she could be taken to jail.

1          And, Your Honor, you know, we've heard some

2    indication from Mr. Martinez that, you know, this may be a case

3    involving a consent defense.  But, Your Honor, when you look at

4    the facts of the dash cam showing the second stop of Victim 1,

5    the fact that he took her license and admitted during

6    questioning that he took her license.  The fact that he didn't

7    conduct a field sobriety test or do any of the markers of what

8    a normal stop would be.  You Honor, that all goes to the

9    strength of the Government's case.  And just the demeanor

10   evidence of Victim 2, Your Honor, just the idea that she would

11   engage in sex with an officer right after her husband has been

12   arrested for DUI, that she would do that voluntarily while her

13   son is in another room.  You know, Your Honor, I think that

14   goes to the strength of the evidence that this is a case

15   involving non-consent and a case involving the abuse of his

16   authority to commit these acts against these women.

17          And so, Your Honor, you know, in the commission of

18   these acts we believe they were premeditated.  And since that

19   Officer Ruiz took steps to cover up his tracks by turning off

20   the audio, by taking Victim 1 to the side of his vehicle out of

21   view of the dash cam.  He took steps to cover up those tracks.

22   And, Your Honor, we just don't know what we don't know about

23   Officer Ruiz because it was a surprise to his family.  All

24   along they didn't know and couldn't know exactly what he was

25   capable of.  And now we have him in a position where he's

working at a temple, he's around other women.  And, you know,
he's an individual that in the Government's view is worse than
the typical criminal because that's a significant barrier you'd
have to overcome from swearing to protect and defend to
exploiting and assaulting and threatening.

And, Your Honor, while it may be not a proper and
necessary consideration for this Court, the Government, you
know, needs to bring to your attention that these women are
still out here, they still fear this man.  And while he's
walking the streets they still have to sleep at night, still
have to be comfortable stepping outside their door and walking
down the street at night and not wondering if Officer Ruiz is
lurking behind every corner.

And so, Your Honor, we believe that Officer Ruiz
should be detained and awaiting trial because he does pose that
threat to women within the community and particularly to the
two women involved in this case.

THE COURT:  Mr. Martinez, one of -- someone was
raising their hand.  Is it one of the family members?

MS. AMAYA:  Your Honor, may I be able to speak?  I'm
his wife.

THE COURT:  Go ahead, ma'am.  I mean -- without you
-- I'll let you speak, but just understand without you being
under oath, without getting a chance to cross-examine, there's
only so much value I could put on that.  And so, I want you to

listen to your lawyer that he -- there's a reason why he didn't want to put you under oath. But, you know, it's your husband, it's his liberty, so go ahead.

MS. AMAYA: I just wanted to say that I've been the one who put my name on the bond. I've been the one to get the lawyer. I've been the one searching for everything. And I'm not the type of person who would just leave someone dangerous with my children. The easiest thing for me to have done would have been to just get a divorce and get me out of this one. And I'm sorry, but like if I'm still here it's for a good reason. And part of us actually wanted the FBI, like we weren't as upset that the FBI got involved because we were actually thinking, well, the FBI's intelligent, hopefully, they'll dig into this, do their research and get to the bottom of what's really happening. But I just want you to know that I wouldn't have been here for no reason.

THE COURT: And, look, ma'am, I respect what you're saying, but I've got -- and that's admirable, but I think that you'd also probably agree with me that if you've heard the evidence over the two days, what's undisputed is that your husband pulled somebody over that was under the influence and as a police officer, you know, his position is engaged in a consensual act. I mean I don't think you'd ever think that before this occurred that your husband would do something like that. And so, that's -- I mean would you? Would you think

that before this that when your husband's working at night and
you're at home that he's pulling over people that are under the
influence and engaging in consensual acts with them?

MR. AMAYA:  I know him well enough to know what he
would be able to do and not be able to do.  And he -- with
women he's very respectful.  A lot of girlfriends have left him
because of that.  He would never do that sort of thing.  I know
him very well, and I know you want to tell me that it's just
the circumstances, but I know him very well.  And sexual
assault, you-all are charging him with sexual assault.  This is
not sexual assault.  I'm sorry.

And like -- I know this is detention hearing and this
is (indiscernible).  And I honestly don't know -- he used just
needs to be with his family.  We want to clear this up.  This
is the time, I'm sorry, but if you-all do for some reason
charge him (indiscernible) you're taking him from us.  We
didn't get the chance -- I didn't get the chance
(indiscernible).  He won't leave.  I know he won't leave.  He
won't leave his children.

THE COURT:  Thank you, ma'am.

Anything else, Mr. Martinez?

MR. MARTINEZ:  (No audible response.)

THE COURT:  You're on mute now again -- can't hear
you.  We still can't -- for some reason we still can't hear
you.  Yeah, sometimes if you -- like if you have a TV in there

1 and you turn the volume on that and that's just the volume on

2 the computer.

3     (Pause.)

4     THE COURT: Yeah, we still can't hear you. Is there

5 another remote there? Because you're not on mute, but you're

6 -- do you have another remote in the room? There you go.

7     MR. MARTINEZ: I got this mic when I started doing

8 ZOOM hearings and I turned it off accidentally.

9     The only thing that I forgot to say was the standard

10 is clear and convincing if this is a danger to the community,

11 which, you know, other than beyond a reasonable doubt. But

12 that's the next burden. And that's all I wanted to put out

13 there.

14     THE COURT: Well, I will -- I will take it under

15 submission. It will take me a few days to write an opinion.

16 You know, obviously, both parties agreed to deal with what

17 Judge Eskridge has given you. Given a lot of thought. I've

18 given you what -- you know, where I was leaning. But I will

19 take your arguments into consideration (indiscernible). But

20 again, Mr. Edwards, Mr. Martinez, you both did, you know, a

21 good job in presenting the evidence (indiscernible).

22     MR. MARTINEZ: Thank you, Your Honor.

23     MR. EDWARDS: Thank you, Your Honor.

24     THE COURT: Thank you. Okay. Thank you all.

25     (Proceeding concluded at 5:38 p.m.)

\* \* \* \* \*

I certify that the foregoing is a correct transcript to the best of my ability due to the condition of the electronic sound recording of the ZOOM/telephonic proceedings in the above-entitled matter.

/S/  MARY D. HENRY

CERTIFIED BY THE AMERICAN ASSOCIATION OF

ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337

JUDICIAL TRANSCRIBERS OF TEXAS, LLC

JTT TRANSCRIPT #63328

DATE FILED:  JANUARY 31, 2021