UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Criminal No. 4-20-CR-582 |
| | § | |
| HECTOR AARON RUIZ | § | |

### UNITED STATES' OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITAL

The Defendant both misapplies the law and misstates the facts in his motion for judgment of acquittal. First, the Defendant asks this Court to acquit him outright on Count One. Although the jury was unable to reach a unanimous verdict on this count at the first trial, this part of the Defendant's motion fails because the evidence is more than sufficient to prove beyond a reasonable doubt that the Defendant deprived Victim #1 of her right to bodily integrity, that his bad purpose was premeditated, and that he committed aggravated sexual abuse and kidnapping in the midst of this rape. Second, the Defendant asks this Court to entirely overturn the jury's guilty verdict as to Count Two. This part of the Defendant's motion likewise fails because the law is clear that the investigation need not be pending at the time of the obstruction, and the facts are clear that the Defendant intended to obstruct an investigation from the moment he turned on his lights and sirens after Victim #1 ran a red light. Consequently, the Court should deny the Defendant's motion.

## STANDARD OF REVIEW

"The only proper basis for a motion for judgment of acquittal is a challenge to the sufficiency of the government's evidence." *United States v. Hope*, 487 F.2d 224, 227 (5th Cir. 2007) (citation omitted). "The well-established standard in this circuit for reviewing a conviction allegedly based on insufficient evidence is whether a reasonable jury could find that the evidence establishes the guilt of the defendant beyond a reasonable doubt." *United States v. Sanchez*, 961 F.2d 1169, 1173 (5th Cir. 1992); *see also United States v. Reyes*, 16 F. Supp. 2d 759, 761 (S.D. Tex. 1998) (Hittner, J.) ("The standard of review for a judgment of acquittal is 'whether, viewing the evidence in the light most favorable to the government, a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt'.") "The evidence adduced at trial, whether it be direct or circumstantial, together with all inferences reasonably drawn from it, is viewed in the light most favorable to the verdict." *Id*. "The assessment of the weight of the evidence and the determination of the credibility of the witnesses is solely within the province of the jury." *Id*. In conducting this review, the court is not "required to analyze the evidence with an eye toward negating every possible inference of innocence, rather, if the fact finder was presented with sufficient evidence to support the verdict reached, that verdict must be upheld." *United States v. Lucio*, 428 F.3d 519, 522

(5th Cir. 2005). "Rather than deciding whether the jury reached the correct verdict, the court must only determine whether the jury's verdict was rational." *United States v. Samson*, 433 F. Supp. 3d 1046, 1051 (S.D. Tex. 2020) (Lake, J.).

## ARGUMENT

The Government is presenting its argument in the order presented in the Defendant's motion.

### I. Count Two – Destroying, Altering, or Falsifying Document in Federal Investigation (18 U.S.C. § 1519)

To establish a violation of 18 U.S.C. § 1519, the United States must prove three elements beyond a reasonable doubt: (1) that the defendant knowingly concealed, covered up, falsified or made a false entry in a record or document; (2) the defendant acted with the intent to impede, obstruct, or influence the investigation or proper administration of a matter; and (3) the matter was within the jurisdiction of the Federal Bureau of Investigation. *See* Dkt No. 150 at 17-18; FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS (CRIMINAL) § 2.65 (2019). Importantly, the Fifth Circuit pattern instructions make clear that "[t]here is no requirement that the matter or investigation have been pending or imminent at the time of the obstruction." *Id; see also United States v. Moore*, 708 F.3d 639, 649 (5th Cir. 2013); *United States v. McCrae*, 702 F.3d 702 F3d 806, 837 (5th Cir. 2012). Nor does the government need to prove that the "the defendant specifically knew the matter or investigation was

within the jurisdiction" of the FBI. *See id; United States v. Hassler*, 992 F.3d 243, 247 (4th Cir. 2021).

The Defendant argues for an acquittal, on the one hand, by reasoning that the matter under investigation at the time he turned off his recording system was the state crime of evading arrest. *See* Dkt No. 167 at 4. This line of argument ignores the obvious language in the instructions provided to the jury that "[t]here is no requirement that the matter or investigation have been pending or imminent." Dkt No. 150 at 18. The Defendant also ignores the testimony of the Government's CAST expert, FBI Agent Christopher Menard, who provided testimony confirming that civil rights investigations are within the jurisdiction of the Federal Bureau of Investigation.

Under a second theory for an acquittal on Count Two, the Defendant argues that the Government must have presented sufficient evidence that the Defendant "turned off his recording system because he had a premeditated motive that he was going to commit sexual assault" in order prevail on this motion. Dkt 167 at 6. The Defendant goes further than the statute and caselaw requires. As stated in the Fifth Circuit Pattern Jury Instructions, Section 1519 contemplates three circumstances: "(1) when a defendant acts directly with respect to the investigation or proper administration of any matter, that is, a pending matter, (2) when a defendant acts in

contemplation of any such matter, and (3) when a defendant acts in relation to any such matter." *United States v. McRae*, 702 F.3d 806, 837 (5th Cir. 2012) (citations omitted). These circumstances do not require the Defendant's elevated showing that the Defendant had a premeditated design to commit sexual assault. It merely requires an obstructive intent on the part of the Defendant. *See McCrae*, 702 F.3d at 838. Even under the Defendant's construction, the Government presented significant and overwhelming evidence of the Defendant's premeditation.

Through its first witness, Arcola Police Department Chief of Police Arika Carr, the Government established that the Defendant had been properly trained in law enforcement patrol procedures and had properly executed law enforcement patrol procedures during field training. The jury saw evidence of an unrelated traffic stop captured days after the rape of Victim #2 in which the Defendant executed a textbook traffic stop. Thereafter, Chief Carr testified to and introduced video of the following evidence of the Defendant's premeditation:

a. Defendant broke policy by not making radio call to dispatch upon activating his lights & sirens after observing Victim #1 run a red light.

b. Defendant broke policy by not make a required radio call after leaving his jurisdiction.

c. Defendant broke policy by not making a required radio call after his attempt to stop Victim #1 transitioned to a pursuit.

d. Despite being engaged in a pursuit of Victim #1, the Defendant does not radio dispatch to do a license plate check on Victim #1. Instead, he ran the check on his in-car computer. Chief Carr provided context to this decision when she testified that an officer should radio dispatch to conduct the DL check because it frees up the officer to focus on the pursuing vehicle.

e. Defendant broke from procedure and pulled his vehicle up next to Victim #1's vehicle while engaged in a pursuit.

f. Defendant broke from procedure and shined his spotlight into Victim #1's vehicle as he pulled up next to her.

g. At the time he was shining his spotlight in Victim #1's vehicle, the Defendant learned through his manual DL search that the vehicle he was pursuing was registered to Victim #1.

h. Defendant violated policy by disabling his active recording after Victim #1 pulled her vehicle over. Chief Carr testified that the Defendant (and other Arcola officers) believe the inactive (or back-up) recordings would never be reviewed by supervisors.

i. Defendant violated policy by permanently disabling his body microphone at the same time he disabled his active recording.

j. Defendant violated policy by failing to use arrest procedures, which would have involved drawing his weapon and placing Victim #1 in handcuffs.

k. Defendant broke from procedure and failed to initiate the 7-step violator contact.

l. Defendant broke from procedure and failed to ask Victim #1 for proof of registration and insurance.

m. Defendant broke from procedure and failed to do a driver's license check on Victim #1.

n. Defendant is seen on dash cam keeping Victim #1's driver's license following the first stop.

o. Defendant activates his lights and sirens a second time after Victim #1 passes him as he's preparing to do a U-turn.

p. Defendant disables his active recording a second time.

q. Defendant activates his lights and sirens a third time after Victim #1 does not stop her vehicle immediately.

r. Defendant disables his active recording a third time after Victim #1 pulls her vehicle over.

    s. Defendant is seen on dash cam keeping Victim #1's driver's license following the second stop.

The jury was presented with evidence of the nineteen affirmative acts or omissions listed above, which were all designed to conceal and cover up the Defendant's bad purpose and to destroy evidence that could be used in a future matter against him. This evidence, when considered with Victim #1's testimony and the Defendant's statement to Texas Rangers, is more than sufficient to support the jury's verdict as to Count Two.

The Government additionally presented compelling evidence regarding the Defendant's lies and admissions during his interview following Victim #1's rape allegation. He admitted that he told Victim #1 to follow him, that he kept her driver's license, and that he told her to "convince me" not to take you to jail. Victim #1 testified that the Defendant's "convince me" drumbeat started at the first traffic stop and continued until the last stop.

The Defendant's admissions are all consistent with Victim #1's testimony that the Defendant twice ordered her to follow him, kept her driver's license, and told her multiple times to convince him not to take her to jail, which she understood to mean that he wanted sex. In his motion, the Defendant misstates Victim #1's testimony regarding the second time she was stopped by the Defendant after

disregarding his order to follow him and attempting to go home. Victim #1 did not testify that at the second stop, the Defendant told her "that he thought RL planned to follow him." She testified that the Defendant told her, "I told you to follow me" and appeared irritated.

Taken together, the Defendant's exhaustive list of affirmative acts or omissions to conceal his activities during the traffic stop, along with his admissions to Texas Rangers, all provided the jury with sufficient evidence of his bad purpose and intent when he stopped Victim #1. The Defendant was creating an opportunity for himself and wanted to ensure that he would never have to account for his criminal activity by destroying any video or audio evidence and by ensuring there were no witnesses or other officers present in the event of an investigation into his activities that night.

In his motion, the Defendant erroneously claims that "there was no evidence presented which showed that Mr. Ruiz tampered with, or deleted any evidence, after the sex acts in the cul-de-sac occurred." *See* Dkt No. 167 at 5. The Defendant either forgets, or hopes beyond hope, that this Court forgot about Chief Carr's testimony regarding the Defendant's false entry in his Arcola PD Event History (Government Exhibit 23). While still at the cul-de-sac after raping Victim #1, the Defendant entered a false location and false activity in his Event History, a 20th affirmative act

that closes the loop on his obstructive intent both before and *after* he violated Victim #1's right to bodily integrity. The jury heard all of this evidence and came to a rational verdict of guilty as to Count Two.

**II.     Count One – Deprivation of Civil Rights Under Color of Law (18 U.S.C. § 242)**

To establish a violation of 18 U.S.C. § 242, the United States needed to prove three elements beyond a reasonable doubt: (1) that the defendant acted under color of law; (2) that the defendant deprived the victim of a right secured or protected by the Constitution or the laws of the United States; and (3) that the defendant acted willfully. *See United States v. Lanier*, 520 U.S. 259, 264 (1997). Proving these three elements would have resulted in a misdemeanor violation. If a § 242 violation includes aggravated sexual abuse or kidnapping, the statute provides for a sentence of any term of years or for life imprisonment.

Viewed in the light most favorable to the Government, a rational trier of fact could have found the essential elements of Count One beyond a reasonable doubt. *See United States v. Reyes*, 16 F. Supp. 2d 759, 761 (S.D. Tex. 1998) (Hittner, J.) The jury was unable to reach a unanimous verdict on Count One, but the evidence presented was sufficient to support a guilty verdict.

The Defendant does not appear to dispute that he was acting under of color of law during Victim #1's traffic stop. He does, however, dispute that the sexual

activity between him and Victim #1 was consensual, which goes to the second element – deprivation of a right secured by the Constitution. When a person acting under color of law sexually touches or rapes a victim, he has violated the victim's right to bodily integrity secured by the Due Process Clause. *See Doe v. Taylor Independent School District.*, 15 F.3d 443, 451-52 (5th Cir. 1994) (describing this is as "incontrovertible").

Before delving further into the second element, it is important to address a few factual misstatements in the Defendant's motion. First, in addressing consent, the Defendant states that "[t]here was no credible evidence that RL was in fear of her life. The jurors observed RL casually walk back to her alleged attacker's vehicle, in no apparent distress, after she had been allegedly sexually assaulted." Dkt No. 167 at 8. The Government introduced Victim #1's text message to Hailee Ammons, her best friend, which stated "Wanna drive imma die" and was sent as Victim #1 was pulling up to the final dark, remote, and abandoned cul-de-sac where she was raped. Victim #1 explained to the jury her fear of the Defendant, the impact of his weapon, and her belief that he could make her disappear. After explaining that she felt she had no choice except to comply and have sex with the Defendant, Victim #1 stated that the Defendant gave her driver's license back to her and allowed her to leave. The jurors saw video footage of Victim #1 driving away and stopping at a

stop sign not far from the cul-de-sac. Victim #1 testified that she exited her vehicle after she saw the Defendant's lights approaching because she didn't want him to become suspicious. In his motion, the Defendant describes her actions as "casually" walking back to his vehicle, but Victim #1 explained that she was walking back to avoid suspicion and explain to the Defendant why she was not driving away immediately. This is hardly evidence of consent.

Second, the Defendant argues she had no credible evidence of fear because Victim #1 met up with a friend who goes by the Instagram handle "PlayaMadeDrako" [hereinafter "PMD"] after reporting the rape to her best friend and her mother and texting her mother that she was going to bed. *Id.* at 8. Victim #1 explained to the jury that she could not sleep because she did not want to be alone in her apartment. She tried unsuccessfully to reach her best friend on the phone and then reached out to PMP because he lived nearby. She testified that she regularly smoked marijuana to deal with her anxiety, and this night was no different. According to her testimony, Victim #1 spent 20-30 minutes with PMD talking and smoking marijuana, which helped her calm down and finally get some sleep at home.

Finally, in order to support a claim of consent, the Defendant argues that the lack of trauma to Victim #1was unusual considering the manner, place, and circumstances of the alleged sexual assault. *Id.* He stretches this even further by

implying that the Government's expert agreed to some extent. This is totally inconsistent with the testimony provided by the Government's experts and the Defendant's expert that most rape victims present with no signs of physical trauma due to the biological properties of the vagina.

### A. Second Element

Even discounting the requirement to view inferences from the evidence in a light favorable to the Government, a reasonable trier of fact, based on the evidence presented, could find the second element proven. Victim #1 provided compelling testimony that her encounter with the Defendant was not consensual. After establishing her event prior to the traffic stop on November 16, 2019, to include smoking marijuana and talking shots of tequila at the Seaside Lounge, Victim #1 told the jury that she wanted to go home – so much so that she declined an invitation from Hailee Ammons to stay her house to avoid getting behind the wheel while under the influence of alcohol. Both the dash cam video from the Defendant's patrol car and Victim #1's testimony corroborate that she did not want to stop her vehicle for the Defendant and that she continued to drive for four minutes after the Defendant activated his lights and sirens.

Victim #1 explained to the jury, at times through tears, her concern that the traffic stop was not normal because the Defendant did not check her registration, did

not conduct a sobriety test despite smelling alcohol on her breath, did not search her vehicle in response to her offer, kept her driver's license, and ordered her to follow him. The jury saw and heard testimony that Victim #1, despite the Defendant's order, tried to go home, only to be pulled over again. The notion of consent was lost the moment the Defendant pulled Victim #1 over a second time.

Victim #1 described for the jury the elevation of her fear and concern as she approached the final stop. Her text messages with Hailee Ammons corroborate that fear as well as toll records from Victim #1's phone showing that she maintained constant communication with Hailee Ammons each time the Defendant left her alone. She further testified that the Defendant told her to hang up the phone, and she described her concern that he would catch her on the phone with Hailee. Her non-consent was also supported by testimony from Hailee regarding Victim's #1's obvious fear, anxiety, and crying as she was on the phone with Hailee while following the Defendant that night.

Victim #1 unequivocally testified that the encounter with the Defendant was not consensual and that she acquiesced to his "convince me" threat out of fear and survival instinct. Government experts, as well as the defense expert, testified that "fawning" is a normal trauma response that victims display in order to survive a threatening encounter. While the Defendant may view Victim 1's alleged phone

activity at the final stop as – allegedly playing music and viewing photos – as evidence of consent, it should be viewed in the light most favorable Victim #1 as an attempt to have the Defendant view her as non-threat and to escape her situation alive.

The Government's post-rape evidence also provided sufficient indicia of non-consent to the jury. Both Victim #1's mother and Hailee Ammons provided testimony regarding Victim #'1 demeanor – crying, panicked, barely able to be understood - when she called each of them to report that she had been raped.

When viewed together with the Defendant's admission that he told Victim #1 to follow him and to convince him not to take her to jail, a reasonable juror can find, convincingly, that the Defendant violated Victim #1's right to bodily integrity.

### B. Third Element

The Government restates the arguments presented in Section I above as to Count Two, which detail how the Defendant committed at least 20 observable (or admitted to) affirmative acts or omissions to show willfulness. The number increases significantly considering Victim #1's testimony to other acts by the Defendant that show willfulness, such as ordering her to get off of her phone and ordering her to drink tequila.

### C. Aggravated Sexual Abuse & Kidnapping

### 1. Aggravated Sexual Abuse.

To establish aggravated sexual abuse, per the jury charge, the Government needed to prove that the Defendant caused Victim #1 to engage in a sexual act: (1) by placing her in fear that she would be subjected to death, serious bodily injury, or kidnapping: or (2) by using physical force against Victim #1. *See* Dkt No. 150 at 22. The Defendant contends in his motion that "[t]he use of physical force is required for the aggravated sexual abuse enhancement to apply," which is plainly incorrect. Dkt No. 167 at 9.

The Government did not proceed on a theory that the Defendant used physical force against Victim #1 but rather presented evidence that she was placed in fear of death, serious bodily injury, and kidnapping. As to death and serious bodily injury, Victim #1 testified about the fear she felt when following the Defendant to the final stop. This fear is corroborated by the "imma die" language in her text message to Hailee Ammons. The jurors heard testimony the Defendant took Victim #1 to a subdivision which was still under construction where she could not readily get any help because there were no houses or streetlights. Alone, lost, and in the dark, Victim #1 was specific in her testimony that she feared the weapon that the

Defendant placed between the two of them in her vehicle, and she feared that he could make her disappear. In the context of the entire traffic stop, a rational trier of fact could conclude beyond a reasonable doubt that Victim #1 engaged in sex with the Defendant because she feared grave consequences if she didn't. To disprove aggravated sexual abuse, the Defendant points to evidence of alleged access to photographs and music during the final stop. *Id.* at 9-10. This evidence, however, when viewed in a light most favorable to the Government, further corroborates Victim #1's fear. She was doing what she needed to do to normalize the situation so that she'd live to see another day. As explained previously, she testified that this same motive led her to exit her vehicle to explain to the Defendant why she stopped at a stop sign after he finally let her go.

### 2. Kidnapping

According to the jury charge, to kidnap a person means to **unlawfully** hold, keep, **detain**, or confine a person against her will and without her consent. The Government provided sufficient evidence to prove kidnapping beyond a reasonable doubt.

Through both Victim #1, the dash camera footage, and the Defendant's own admission, the juror were presented with clear evidence that the Defendant told Victim #1 to follow him during the first traffic stop and that he pulled her over a

second time when she disobeyed his order. Victim #1 testified that she did not believe she had a choice not to follow him and that she believed he would continue to pull her over. She did not feel she was free to leave, so she did not. Instead, she called her best friend in order to maintain a lifeline.

Chief Arika Carr established through her testimony that the Defendant unlawfully detained Victim #1. Although the Defendant had a lawful basis to initially stop and detain Victim #1, Chief Carr's testimony established that the stop transitioned to an unlawful detention when the Defendant threw all law enforcement procedures out the window, confiscated Victim #1's driver's license, and put this intoxicated woman back on the road to follow him outside of his jurisdiction.

The Defendant materially misstated facts in his motion, which states that "[t]he testimony revealed that it is not uncommon for police officers to keep a driver's license after a traffic stop." Dkt No. 167 at 10. The Defendant conveniently left out the part of Chief Carr's testimony establishing that this happens only when the person is arrested. Victim #1 should have been arrested, but the Defendant had other illicit plans that resulted in her being unlawfully detained – kidnapped.

## CONCLUSION

The Government asks this Court to find that the Government presented sufficient evidence that a reasonable trier of fact could find the Defendant guilty

beyond a reasonable doubt of Counts One and Two and therefore to deny the Defendant's motion for a judgment of acquittal.

                                         Respectfully submitted,

                                         ALAMDAR S. HAMDANI
                                         United States Attorney

By:   */s/ Sharad S. Khandelwal*
        SHARAD S. KHANDELWAL
        SEBASTIAN EDWARDS
        Assistant United States Attorneys
        U.S. Attorney's Office, S.D. Texas
        Tel: (713) 567-9000

## Certificate of Service

I certify that, on the date this was filed with the Court, a copy of the foregoing was provided to counsel for Defendant via ECF and/or e-mail.

                                         */s/ Sharad S. Khandelwal*
                                         SHARAD S. KHANDELWAL
                                         Assistant U.S. Attorney